ILLINOIS POWER COMPANY, Petitioner-Appellant, v. THE ILLINOIS COMMERCE COMMISSION *et al.*, Respondents-Appellees.—THE PEOPLE *ex rel.* THE ATTORNEY GENERAL'S OFFICE, Petitioner-Appellant, v. THE ILLINOIS COMMERCE COMMISSION *et al.*, Respondents-Appellees.—THE PEOPLE *ex rel.* THE OFFICE OF PUBLIC COUNSEL *et al.*, Petitioners-Appellants, v. THE ILLINOIS COMMERCE COMMISSION *et al.*, Respondents-Appellees.

Third District Nos. 3—89—0282, 3—89—0297, 3—89—0318 cons.

Opinion filed February 8, 1991.

Neil F. Hartigan, Attorney General, of Springfield (Robert W. Cushing and Kimary Lee, Assistant Attorneys General, of Chicago, of counsel), for petitioner People *ex rel.* Attorney General's Office.

Stephen Fogel, of Office of Public Counsel, of Chicago, for petitioner People ex rel. Office of Public Counsel.

Robert L. Graham and Caesar A. Tabot, both of Jenner & Block, of Chicago, for petitioner Citizens Utility Board.

Neil F. Hartigan, Attorney General, of Springfield (Kathleen Nolan and John P. Kelliher, Special Assistant Attorneys General, and Clyde Kurlander, Assistant Attorney General, of Chicago, of counsel), for respondent Illinois Commerce Commission.

David G. Gilbert, Ronald D. Jolly, and Patricia O'Brien, all of Governor's Office of Consumer Services, of Chicago, for respondent Village of Buffalo.

Thomas F. Londrigan, of Londrigan, Potter & Randle, P.C., of Springfield, for respondent Federation of Rural Illinois Electric Ratepayers.

Eric Robertson, Randall Robertson, and Edward C. Fitzhenry, all of Lueders, Robertson & Konzen, of Granite City, for other respondents.

Allan Horwich, Rebecca J. Lauer, Susan S. Gouinlock, and William M. Hannay, all of Schiff, Hardin & Waite, and William J. Harte, Ltd., both of Chicago (Owen E. MacBride and William J. Harte, of counsel), for Illinois Power Company.

PRESIDING JUSTICE STOUDER delivered the opinion of the court:

Appellants, Illinois Power Company (No. 3—89—0282), the Illinois Attorney General (No. 3—89—0318), and the Office of Public Counsel/ Citizens Utility Board (OPC/CUB) (No. 3—89—0297) appeal from an order entered on March 30, 1989, by appellee, the Illinois Commerce Commission (the Commission). By motion of the parties, the separate appeals have been consolidated.

This consolidated appeal concerns Illinois Power's Clinton Unit I. Clinton is an 823 megawatt (MW) nuclear power electrical generation station. Clinton was originally designed as a two-unit, 1,900 MW facility. Unit II was canceled in 1983. In 1973, Clinton was forecast to be in commercial operation in June 1980 at a cost of $429,438,000. The final cost of Clinton at its in-service date for accounting purposes, April 24, 1987, was $4,224,600,000. On that date, Clinton first provided electricity to Illinois Power's system for distribution to cus-

tomers. Under criteria established by the Commission, this was the date on which construction costs ceased being capitalized. On November 24, 1987, Clinton satisfied operational criteria the Commission had set for inclusion in rate base.

Illinois Power is presently a co-owner of Clinton with the Soyland Power Cooperative. As of March 30, 1989, Illinois Power owned 86.58% of Clinton. Soyland is not regulated by the Commission.

The proceedings in this case commenced on February 1, 1984, when the Commission, on its own motion, ordered that hearings be held to (1) investigate various proposals for moderating the initial rate increase associated with placing Clinton in service, (2) review any economic reasonableness studies, and (3) examine the Clinton licensing process (docket No. 84—0055). The Commission first considered the economic reasonableness of completing Clinton. On August 7, 1985, the Commission entered an interim order in docket No. 84—0055 which ordered Illinois Power to complete construction of the Clinton project.

In August 1984, the Commission ordered an independent audit of Clinton construction costs be conducted prior to the plant's inclusion in Illinois Power's rate base. On April 24, 1985, the Commission entered an interim order in docket No. 84—0055 selecting Touche Ross & Co. and its co-contractor, the Nielson-Wurster Group (TR/NW), to perform the independent audit of Clinton. The focus thereafter in docket No. 84—0055 was determination of the costs reasonably incurred in constructing Clinton. In previous Commission orders commencing in 1979, the Commission had allowed $1,539,774,000 of Illinois Power's share of Clinton costs to be included in the rate base as construction work in progress (CWIP). The inclusion of Clinton CWIP in Illinois Power's rate base was upheld in *Citizens for a Better Environment v. Illinois Commerce Comm'n* (1981), 103 Ill. App. 3d 133, 430 N.E.2d 684.

On November 19, 1987, Illinois Power filed tariff sheets in which it proposed a general increase in electric rates. The resulting proceedings were designated docket No. 87—0695. Illinois Power moved to consolidate docket Nos. 84—0055 and 87—0695. Illinois Power indicated that it was desirable to complete all proceedings in docket No. 84—0055 relating to the Clinton audit within a time frame that would enable the Commission to enter a final order determining the reasonable cost of Clinton prior to or contemporaneous with its final order on Illinois Power's proposed rate increase. In order to accomplish this scenario, Illinois Power agreed to refile its tariff sheets containing the same proposed increase. This proceeding was designated docket No.

88—0256. Thereafter, the three proceedings were consolidated.

Numerous parties petitioned to intervene in the proceedings including the Illinois Attorney General, the Office of Public Counsel (OPC), the Citizens Utility Board (CUB), Illinois Industrial Energy Consumers (IIEC), and the Governor's Office of Consumer Services on behalf of the Village of Buffalo. Evidence was presented in the proceedings by Illinois Power, the intervenors and the Commission staff.

In its rate request, Illinois Power proposed a rate moderation plan. Under the plan, electric rates were to increase in the first year by 12.5% or $109.5 million, with yearly increases over the next 7 to 10 years of between 3.3% and 5.9% depending on inflation. This was to be followed by a rate decrease in the last year of the plan.

On February 9, 1989, the hearing examiner issued a proposed order recommending that Illinois Power's rate moderation plan be rejected and that Illinois Power be granted a one-time rate increase of $44.8 million. On March 30, 1989, the Commission entered its order in these proceedings with three Commissioners dissenting. In the order, the Commission found that affirmative evidence in the record established that Illinois Power's share of the prudent and reasonable cost of Clinton as of December 1987 was $3,136,909,000 and that Illinois Power's share of the unreasonable construction costs of Clinton was $665,729,000. The Commission further determined that only 27.2% of Clinton was used and useful, and disallowed a common equity return on the remaining 72.8% of Illinois Power's reasonable and prudent investment in Clinton. The Commission allowed a full return of the capital associated with the prudently incurred costs of Clinton (depreciation), and allowed a full return on the debt and preferred stock associated with prudently incurred Clinton costs. The Commission allowed Illinois Power a rate increase of $60,536,000 or 6.89%.

Illinois Power and the Attorney General each filed applications for rehearing with the Commission. The Office of Public Counsel and the Citizens Utility Board filed a combined application for rehearing and will be referred to as OPC/CUB hereafter. The Village of Buffalo and IIEC also filed applications for rehearing. On May 9, 1989, the Commission voted to deny all the applications for rehearing. Illinois Power, the Attorney General and OPC/CUB each filed petitions for review with this court raising numerous objections to the Commission's order.

I. OPC/CUB'S MOTION TO DISMISS ILLINOIS POWER'S APPEAL

■ As a preliminary matter, OPC/CUB have filed a motion to dis-

miss Illinois Power's appeal, contending Illinois Power's petition for review was filed prematurely and that this court therefore lacks jurisdiction.

On May 9, 1989, the Commission voted to deny Illinois Power's application for rehearing. That same day, Illinois Power filed its petition for review with this court and filed a notice of appeal with the Commission clerk. The Commission did not serve its decision to deny the application for rehearing until May 10, 1989.

Section 10—201(a) of the Public Utilities Act (the Act) provides in pertinent part: "Within 30 days after the service of any order or decision of the Commission refusing an application for rehearing of any rule, regulation, order or decision of the Commission, *** any person or corporation affected by such rule, regulation, order or decision, may appeal to the appellant court ***." Ill. Rev. Stat. 1989, ch. 111²/₃, par. 10—201(a).

OPC/CUB argue that because Illinois Power filed its appeal before the Commission served its decision, Illinois Power failed to file its petition for review within the 30-day filing period set forth in section 10—201(a). In other words, OPC/CUB maintain that, under section 10—201(a), a party may not file a petition for review until after the Commission has served notice of its decision to deny the party's application for rehearing, even when the party knows of the Commission's decision before it is formally notified. OPC/CUB cite no cases which directly address this issue and those cases they do cite are distinguishable.

In the instant case, there is no question that the Commission decided on May 9, 1989, to deny Illinois Power's application for rehearing. OPC/CUB have not raised any issue as to the finality of the Commission's decision. Under the circumstances, we find no deficiency in our jurisdiction to consider Illinois Power's appeal. OPC/CUB's motion to dismiss Illinois Power's appeal is denied.

## II. THE SCOPE OF JUDICIAL REVIEW

■ On review, a court may affirm, or reverse an order or decision of the Commission in whole or in part, or remand the decision in whole or in part where a hearing has been held before the Commission, and state the questions requiring further hearings or proceedings and give such other instructions as may be proper. (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 10—201(e)(v).) A reviewing court can only reverse an order or decision entered by the Commission, if (1) the findings of the Commission are not supported by substantial evidence, (2) the order or decision is without the jurisdiction of the Commission, (3)

the order or decision violates the Federal or State Constitution or laws, or (4) the proceedings or manner by which the Commission decided its order or decision violated the Federal or State Constitution or laws, to the prejudice of the appellant. (Ill. Rev. Stat. 1989, ch. 111⅔, par. 10—201(e)(iv).) On review, the findings and conclusions of the Commission on questions of fact must be taken *prima facie* to be true, and the order held to be *prima facie* reasonable: the burden of proof on all issues raised on appeal is upon the party bringing the appeal. (Ill. Rev. Stat. 1989, ch. 111⅔, par. 10—201(d).) However, the Commission's interpretation on a question of law is not binding upon a reviewing court. *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1989), 136 Ill. 2d 192, 555 N.E.2d 693.

### III. USED AND USEFUL

Both Illinois Power and the Attorney General appeal from the Commission's determination that only 27.2% of Clinton is used and useful for purposes of inclusion in Illinois Power's rate base. Illinois Power contends that the Commission failed to apply the appropriate law in making the used and useful determination, that the finding is arbitrary and capricious, and that the Commission's actions in making this determination rendered the order unconstitutional. In addition, Illinois Power argues the Commission erred in refusing to consider certain proffered evidence of peak 1988 electrical demand in making the used and useful determination. While arguing that Illinois Power's objections are meritless, the Attorney General challenges the method the Commission employed in determining what percentage of Clinton was needed to meet customer demand. OPC/CUB and the other intervenors maintain the Commission's determination on this issue was correct.

Section 9—211 of the Act states: "The Commission, in any determination of rates or charges, shall include in a utility's rate base only the value of such investment which is both prudently incurred and used and useful in providing service to public utility customers." Ill. Rev. Stat. 1989, ch. 111⅔, par. 9—211.

Section 9—212 provides in pertinent part:

> "No new electric utility generating plant or gas production facility, or significant addition to existing facilities or plant, shall be included in a utility's rate base unless and until the utility proves, and the Commission determines, that such plant or facility is both prudent and used and useful in providing utility service to the utility's customers. ***

A generation or production facility is used and useful only if, and only to the extent that, it is necessary to meet customer demand or economically beneficial in meeting such demand. No generation or production facility shall be found used and useful until and unless it is capable of generation or production at significant operating levels on a consistent and sustainable basis." Ill. Rev. Stat. 1989, ch. 111⅔, par. 9—212.

Section 9—215 provides:

"The Commission shall have power to consider, on a case by case basis, the status of a utility's capacity and to determine whether or not such utility's capacity is in excess of that reasonably necessary to provide adequate and reliable electric service. Excess capacity for purposes of this Section shall mean capacity in excess of that reasonably necessary to provide adequate and reliable electric service. Such consideration shall be related to the utility's historic and projected peak.

The Commission is empowered to make appropriate and equitable adjustments to rates for utility service upon a finding of excess capacity.

With respect to generating capacity existing or under construction on the effective date of this amendatory Act of 1985, any such determination and adjustment to rates, and any determination as to whether such capacity is used and useful for any purpose under this Act, shall be limited to the determination and adjustment, if any, appropriate under the law in effect prior to such effective date." Ill. Rev. Stat. 1989, ch. 111⅔, par. 9—215.

The effective date of the 1985 amendments to the Act was January 1, 1986.

In the instant case, Commission staff member Tim Kelly testified that he was aware of only one definition of "used and useful"—the definition found in section 9—212 of the Act. He therefore assumed that the section 9—212 definition applied to facilities which, like Clinton, were under construction prior to 1986. Based on the definition of "used and useful" in section 9—212, Kelly employed a two-part test to determine whether Clinton was used and useful. Under the test, the first question is whether the plant is needed to provide reliable electric service to the utility's customers (the needed test). Kelly testified that it is appropriate to include an entire generating unit in rate base if only one MW of the plant's capacity is needed to maintain its required reserve margin. Reserve margin is the amount by which a utility's generating capacity, available at the time of system peak de-

mand, exceeds the maximum demand on its system. If the plant fails the needed test, then in order to be considered used and useful, the unneeded facility must be economically beneficial in meeting customer demand (the economic benefits test). Kelly testified that the economic benefit to ratepayers of a new unneeded plant is equal to the reduction in test year fuel and other operation and maintenance expenses which result from the expected operation of the plant. The used and useful portion of the investment is the value that, when ratebased, will result in an increase in test year revenue requirements which is equal to the net economic benefit provided by the plant to ratepayers. Kelly used the test year 1987 in making his used and useful determination.

Kelly calculated that Illinois Power's reserve margin without Clinton was 39.93%. Since this was greater than the 15% to 20% minimum reserve margin required of Illinois Power as a member of the Mid-America Interconnected Network (MAIN), Kelly concluded that Clinton was not needed to meet customer demand. He also concluded that none of Illinois Power's investment in Clinton was economically beneficial to ratepayers and that the entire investment in Clinton was therefore not used and useful. He recommended that none of the Clinton investment be included in rate base.

In Kelly's opinion, the appropriate treatment for plant investment that is prudently and reasonably incurred but not used and useful is to allow a recovery of the investment and a return on the debt and preferred stock portion of the investment, but to disallow a return on the common equity portion of the investment.

IIEC presented the testimony of Maurice Brubaker, vice-president of Drazen-Brubaker & Associates, Inc. In Brubaker's opinion, an investment is used if it is actually operating in the course of providing service to customers, and useful if it is necessary to provide service and does so in an economical fashion. Brubaker proposed a slightly different two-part test for determining the used and useful issue: (1) is the additional capacity used and useful in the sense that it is necessary to meet customer demand and provide the appropriate reserve margin, and (2) even if it is needed, is the total cost of that capacity used and useful in the sense that it represents an economic alternative and produces an acceptable level of rates or rate increases.

In determining whether Clinton was used and useful, Brubaker examined Illinois Power's reserve margin over a projected 13-year period. In his opinion, an adequate level of reliability is achieved when Illinois Power has available capacity (installed plus purchases) in an amount equal to its projected firm peak load plus a margin of 17%

over that peak load. Illinois Power uses a 17% planning reserve margin. Brubaker concluded that Illinois Power's reserve margin with Clinton was 52.1% in 1988 and that none of Clinton would be needed to meet Illinois Power's planning reserve margin until 1996. In making this determination, Brubaker used a declining target reserve margin, starting with 30% in 1988 and dropping by one percentage point a year until his target reserve margin equaled Illinois Power's planning reserve margin of 17%. He started with a 30% target reserve margin because that was equivalent to a planning reserve margin of 17% plus one-half of Clinton's capacity. Based on Brubaker's testimony, it was IIEC's position that 75% of Clinton's capacity was not used and useful and that the Commission should deny a common equity return on 75% of the Clinton investment determined to be reasonably incurred.

Peter Lanzalotta of Whitfield Russell Associates testified on behalf of OPC/CUB and the Village of Buffalo. He concluded: (1) that Clinton was not needed for system reliability until at least 1996 and would not be fully needed for system reliability until 2004; (2) that Clinton would not provide a net economic benefit to ratepayers in the near term; and (3) that Clinton was not likely to produce an economic benefit over its expected life, when compared to coal-fired base load generation. Lanzalotta recommended a 15% reserve margin be employed as the target reserve margin and that only that portion of Clinton required to attain the 15% reserve margin be included in the rate base as used and useful.

It was Illinois Power's position that the evidence in the record supported a finding that Clinton was fully used and useful under the law in effect prior to 1986. It pointed to the fact that Clinton (1) was in commercial operation as an electric generating facility, (2) was operating on an economic dispatch basis, *i.e.*, the most economical units were being used more hours over a period of time and generated the greatest number of kilowatt hours per KW of capacity, (3) was providing energy to serve its customers, (4) had been generating substantial quantities of electricity and operating at significant operating levels on a consistent and dependable basis, and (5) had the lowest fuel costs and lowest production costs.

In its order, the Commission noted that the parties cited the same cases to support their conflicting positions. The Commission found that a review of the pre-1986 law cited by the parties revealed that Illinois courts had long recognized that the Commission had broad discretion in making used and useful determinations. While acknowledging that the Commission had never adopted a used and useful disal-

lowance similar to those proposed in this case, it was the Commission's opinion that it was not precluded from adopting such a disallowance if warranted by the circumstances. The Commission noted that no Illinois Supreme Court case offered a conclusive definition of "used and useful" under pre-1986 law, nor had the supreme court placed any limits on the Commission's authority in making used and useful determinations. The Commission rejected Illinois Power's interpretation of pre-1986 law, and found that it had the discretion to examine reserve margins (needed) and the economic benefits of Clinton in reaching an equitable decision. The Commission concluded that the cases cited by the parties did not provide conclusive guidance as to the scope of its discretion due to factual differences in the cited cases.

In determining what portion of Clinton was needed, the Commission found that only Brubaker's method gave "proper recognition to the realities of capacity additions." It found that Kelly's approach failed to take into account the size of the new unit, and that Lanzalotta's approach failed to recognize that new plant capacity cannot be precisely matched to capacity needs because of the difficultly in forecasting and the long lead time of construction. However, the Commission found that the 13-year period utilized by Brubaker in examining reserve margin was too long. The Commission concluded that in determining whether Clinton's capacity was needed, it was reasonable to consider projected reserve margins for a three-year period from 1988 to 1990. Using Mr. Brubaker's declining target reserve margins of 30% for 1988, 29% for 1989, and 28% for 1990, the Commission calculated that the average percentage of Clinton needed to attain these target reserve margins was 27.2%. Therefore, the Commission concluded that 27.2% of Clinton's capacity was needed.

The Commission held that the evidence presented by Illinois Power did not convince the Commission that Clinton would result in an economic benefit to ratepayers, and that, therefore, the used and useful determination rested on the needed test. Having determined that only 27.2% of Clinton was needed, the Commission concluded that 27.2% of Clinton was used and useful. In balancing the interests of shareholders and ratepayers, the Commission concluded that the most equitable way to apportion the used and useful disallowance was to permit a return on the debt and preferred stock portion of all prudently incurred Clinton investment and the recovery of such investment, but to deny a return on the common equity portion of prudently incurred investment that was not used and useful.

On appeal, Illinois Power contends that Clinton is fully used and useful under pre-1986 law, and that the Commission misinterpreted

section 9—215 and pre-1986 law. Illinois Power argues that under the criteria used in cases and Commission decisions prior to 1986, Clinton is fully used and useful. Illinois Power claims that the uncontroverted evidence showed that Clinton met the criteria established in pre-1986 cases in that Clinton was: (1) in full operation as part of its system, (2) generating substantial quantities of electricity for customers, (3) was operating on an economic dispatch basis, and (4) enhanced system reliability through diversification of fuel mix.

The parties agree that, under Section 9—215, pre-1986 law governs the used and useful determination in this case. However, they disagree on what is the proper interpretation of pre-1986 law. At the outset, it should be pointed out that, although not clear from the parties' arguments before this court, it appears Illinois Power is not challenging the Commission's authority to make used and useful disallowances *per se*. Rather, Illinois Power is challenging the scope of the Commission's discretion to choose the test or criteria to employ in determining whether Clinton is used and useful. Therefore, the issue of the Commission's authority to make used and useful disallowances under pre-1986 law is not before this court. The issue is whether the criteria employed in making that determination in this case (the needed and economic benefits tests) were appropriate under the law in effect prior to January 1, 1986. Since this is a question of law, the Commission's finding is not binding on this court. *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1989), 136 Ill. 2d 192, 555 N.E.2d 693.

■ After reviewing the cited cases and Commission decisions, and in view of the provision in the last paragraph of section 9—215 of the amended Act, we hold that the Commission erred in using the needed and economic benefits tests to determine whether and what portion of Clinton was used and useful for purposes of inclusion in Illinois Power's rate base.

The tests the Commission employed are those used in section 9—212 of the amended Act to define used and useful. The Commission concedes that it had never used these tests prior to this proceeding. However, the Commission argues that the last paragraph of section 9—215 was not meant to limit the Commission's discretion. The Commission argues that prior to 1986, there was no test or set criteria for making used and useful determinations, and that it had broad discretion to choose the criteria or test to employ in a particular circumstance. Therefore, it had the discretion under pre-1986 law to employ the standard which is now part of the present Act. We find this contention to be without merit.

By defining "used and useful" in the amended Act, and then requiring that used and useful determinations for capacity existing or under construction on January 1, 1986, be limited to the determinations and adjustments, if any, appropriate under the law in effect prior to that date, the legislature was expressing its intent to change the method by which such determinations were made. If the legislature had intended the Commission to have the discretion to use the tests set forth in the amended Act, there would have been no need for the last paragraph of section 9—215. The Commission erred in using the needed and economic benefits tests, and should have employed the criteria or tests utilized in pre-1986 proceedings. Therefore, the Commission's decision on the used and useful issue must be reversed and the cause remanded for a redetermination of whether and/or what portion of Clinton is used and useful. The Commission will be directed not to employ the needed and economic benefits tests, and must determine the issue on the basis of established pre-1986 standards.

In view of our disposition of this issue, and the fact that the Commission must redetermine the used and useful question, the proffered evidence on actual 1988 peak load demand may or may not be appropriate in making that determination. We therefore need not reach this issue. In addition, we need not address Illinois Power's arbitrary and capricious, and constitutional arguments. Our finding that the Commission erred in using the needed test makes it unnecessary to consider the Attorney General's argument on appeal that the Commission erred in utilizing Brubaker's method rather than Lanzalotta's.

IV. REASONABLE COST ISSUES

Section 9—213 of the Act provides in pertinent part:

"The cost of new electric utility generating plants and significant additions to electric utility generating plants shall not be included in the rate base of any utility unless such cost is reasonable. ***

* * *

'Reasonable', as used in this Section, means that a utility's decisions, construction, and supervision of construction, underlying the costs of new electric utility generating plants and significant additions to electric utility generating plants resulted in efficient, economical and timely construction. In determining the reasonableness of plant costs, the Commission shall consider the knowledge and circumstances prevailing at the time of each relevant utility decision or action." Ill. Rev. Stat. 1989, ch. 111²/₃, par. 9—213.

■ Under the Act, a reviewing court shall reverse the Commission's findings if the findings are not supported by substantial evidence. (Ill. Rev. Stat. 1989, ch. 111⅔, par. 10—201(e)(iv)(A).) The credibility of expert witnesses and the weight to be given their testimony are matters for the Commission to decide as the finder of fact. (*Lefton Iron & Metal Co. v. Illinois Commerce Comm'n* (1988), 174 Ill. App. 3d 1049, 529 N.E.2d 610.) A reviewing court may not substitute its interpretation of the evidence for that of the Commission. *People ex rel. Hartigan v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 120, 510 N.E.2d 865.

Pursuant to the commission's 1985 interim order in docket No. 84—0055, Touche Ross & Co. and Touche's co-contractor, the Nielsen-Wurster Group (TR/NW), performed an independent audit of the reasonableness of the costs incurred by Illinois Power in constructing and financing Clinton. TR/NW's audit was divided into two phases. Phase I covered the period from the inception of the Clinton project through March 31, 1985. Phase II covered the period from April 1, 1985, through November 24, 1987. After expending over 20,000 professional man-hours on the audit, TR/NW determined that of the $4,224,600,000 incurred as of April 1987 in constructing Clinton, $3,765,500,000 represented reasonable costs, and $459,100,000 represented costs which were unreasonably incurred.

MHB Technical Associates (MHB) conducted an audit of Clinton construction costs for the Attorney General and the Office of Public Counsel. MHB determined that there was a total of $1,217,700,000 in construction costs unreasonably incurred. Other intervenors presented expert witnesses who testified that if Clinton had been prudently managed, it would have been canceled prior to completion.

Illinois Power commissioned three firms to conduct audits of various aspects of the Clinton project. Ebasco Services Inc., Burns & Roe Co., and Theodore Barry & Associates concluded that all costs associated with the Clinton project were reasonably and prudently incurred.

The Commission determined that there was a total of $712,248,000 in unreasonable costs. The Commission found that of this total $471,000,000 resulted from 18 months of delay associated with 1982 stop work actions, and $112,100,000 resulted from a three-month post-fuel load delay. The Commission also concluded there was $128,512,000 in additional allowance for funds used during construction (AFUDC) unreasonably incurred, and $636,000 of unreasonable costs associated with Illinois Power's failure to properly pursue back-charges against one of its supplier/vendors. In allocating the unreasonable costs, the Commission multiplied the unreasonable direct costs

of $346,640,000 by 86.58% to take into account Soyland Power Cooperative's co-ownership of the Clinton project. The Commission added the resulting $300,121,000 to the $365,608,000 in unreasonably incurred AFUDC and found Illinois Power's share of the unreasonable costs to be $665,729,000. The Commission concluded that Illinois Power's share of the prudent and reasonable cost of Clinton was $3,136,909,000.

On appeal, Illinois Power, the Attorney General and OPC/CUB each challenge various findings and conclusions of the Commission relating to the reasonable cost of Clinton. Because many of the parties' arguments overlap, the issues will be addressed as much as possible in the sequence that the underlying costs were incurred in the Clinton project.

## A. THE MARK III CONTAINMENT SYSTEM

At issue in the determination of whether Illinois Power's engineering and design management of the Clinton project was reasonable was Illinois Power's management of what was referred to as the Mark III containment issues. Clinton utilizes a boiling water reactor-6 (BWR-6) and Mark III containment system, designed by the General Electric Company (GE). The Mark III is a pressure suppression containment system which is composed of a drywell and a pressure suppression pool housed within the containment building. The drywell houses the reactor, the coolant loops and other primary connections. The pressure suppression pool acts to alleviate pressure increases during transient conditions, when safety relief valves open and discharge steam directly into the pool, and during loss-of-coolant accidents, when steam discharged from a primary system pipe failure escapes from the drywell into the suppression pool through vent holes. The pressure suppression pool exhausts directly into the containment building. Steam discharges, resulting from the opening of safety relief valves and loss-of-coolant accidents, result in suppression pool disturbances whose ramifications extend to the pool boundaries and the structures submerged in the pool or in the vicinity of the pool. These pool disturbances are collectively known as "pool hydrodynamics," and the resulting loads are known as "hydrodynamic loads." GE was responsible for furnishing, according to a schedule, load definitions which would allow Illinois Power and Illinois Power's architect/engineer, Sargent & Lundy, to complete the design and construction of the reactor building. The record showed that GE was unable to timely furnish the data necessary to complete the reactor design.

TR/NW testified that hydrodynamic load problems impacted the

schedule of all BWR-6/Mark III facilities in general and Clinton in particular from 1973 to 1984. According to MHB, the Mark III hydrodynamic load problems became known to GE in 1973-1974. In 1975, the staff at GE compiled a self-critical study relating to the BWR-6/ Mark III system, known as the Reed Report. Among the technical problems identified in the report were problems with pool swelling loads, relief valve discharge loads, and potential radiation exposure. TR/NW concluded that at the time of the Reed Report, GE knew that significant expenditures associated with Mark III containment issues would be required in order to meet Clinton design and construction needs. The Reed Report was released to the public in 1987.

In its audit, TR/NW found that resolution of Mark III containment issues caused a 27-month delay in the Clinton project. However, TR/NW found that the Mark III containment issues were not foreseeable and thus not controllable by Illinois Power. TR/NW concluded that there was no imprudency on the part of Illinois Power with regard to Mark III containment issues. TR/NW found that Illinois Power was not in a position in 1975 to know of the problems listed in the Reed Report, nor did the Reed Report demonstrate any imprudence on the part of Illinois Power. TR/NW indicated that the Reed Report raised questions as to whether Illinois Power might have claims against GE.

MHB found that while the initial actions of Illinois Power concerning Mark III issues were reasonable, MHB determined that Illinois Power's performance was inadequate with respect to later design management. MHB concluded that among other things, Illinois Power unduly relied on GE to resolve Mark III issues, and failed to properly control the GE/Sargent & Lundy interface. MHB recommended an unreasonable cost disallowance of $162,000,000.

The Commission accepted TR/NW's finding that overall there was no unreasonable impact on the Clinton project as a result of Illinois Power's engineering and design management. With respect to the Mark III containment issues, the Commission found that the evidence established that Illinois Power's supervision of GE was reasonable given the knowledge and circumstances prevailing at the time. The Commission stated that it was not passing judgment on the performance of GE, and that under section 9—213 of the Act, its review was limited to the actions and decisions of Illinois Power.

On appeal, the Attorney General and OPC/CUB both challenge the Commission's conclusion on this issue. The Attorney General contends the Commission's conclusion is contrary to the manifest weight of the evidence and that it erred in rejecting MHB's recommended

disallowance. The Attorney General argues that the record on the Mark III issues was not sufficient to overcome the testimony of MHB that Illinois Power's actions were unreasonable. In addition, the Attorney General argues the evidence establishes that Illinois Power's supervision of GE was unreasonable.

■ As the Commission correctly points out, the fact that there was conflicting evidence on the Mark III issues does not mean that the Commission erred. The issue is whether the Commission's finding is supported by substantial evidence. The Commission received voluminous and in some cases contradictory testimony concerning events surrounding the Mark III design and licensing process. After reviewing the evidence presented, the Commission adopted TR/NW's finding that Illinois Power's actions concerning Mark III issues and its supervision of GE were reasonable. The Commission concluded that no unreasonable costs resulted from the Mark III problems. We find that the record contains substantial evidence to support this conclusion. The Attorney General is asking this court to reweigh the evidence on this issue. On findings of fact, this court will not substitute its judgment for that of the Commission.

■ In their appeal, OPC/CUB argue that the Commission erred in interpreting section 9—213 as barring the Commission from reviewing GE's actions concerning the Mark III issues and imputing GE's unreasonable actions to Illinois Power. OPC/CUB also contend that by adopting TR/NW's findings on this issue, the decision was in violation of section 9—213 because it allows in rate base costs which were not shown to be reasonable.

Under section 9—213, whether costs are reasonable is to be determined by looking at whether "a utility's decisions, construction, and supervision of construction *** resulted in efficient, economical and timely construction." (Ill. Rev. Stat. 1989, ch. 111²/₃, par. 9—213.) The Commission found that, given the knowledge and the circumstances prevailing at the time of each relevant decision, Illinois Power's supervision of GE was reasonable. The Commission concluded that section 9—213 limited its review to the actions and decisions of the utility.

OPC/CUB contend the Commission erred in limiting the scope of its review to the actions of Illinois Power. OPC/CUB argue that under *People ex rel. Hartigan v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 120, 510 N.E.2d 865, the Commission had the authority to hold Illinois Power responsible for GE's actions. OPC/CUB contend that in *Hartigan*, Commonwealth Edison was held to share responsibility for the failure of the quality assurance/quality control (QA/QC) program

of two of its contractors. However, in *Hartigan,* Edison's responsibility stemmed from imprudence in supervising its contractors' QA/QC programs, and not from the actions of the contractors themselves. Therefore *Hartigan* does not support OPC/CUB's contention.

In addition, we note that OPC/CUB cite decisions from other jurisdictions as supporting their interpretation of section 9—213. However, those cases are based on other State's statutes, and there is no showing these statutes are the same or even similar to section 9—213.

We also find no merit to OPC/CUB's contention that adoption of TR/NW's findings regarding Mark III issues allowed unreasonable costs into Illinois Power's rate base. TR/NW concluded that Illinois Power's actions and decisions regarding Mark III issues were prudent, and that no unreasonable costs were incurred. The fact that TR/NW indicated that Illinois Power may have claims against GE does not mean that TR/NW had doubts about whether all Mark III associated costs were reasonable. Nor does it illustrate that TR/NW either assumed costs were reasonable or recommended that costs be included in the rate base because they were not shown to be unreasonable.

In sum, we find the Commission correctly read section 9—213 as limiting its review to the actions and decisions of Illinois Power. The Commission did not err in adopting TR/NW's conclusion that no unreasonable costs resulted from Mark III containment issues.

### B. CONSTRUCTION MANAGEMENT ISSUES

The Commission determined that, as a result of unreasonable actions on the part of Illinois Power, the Clinton project was delayed a total of 21 months. The delay was composed of an 18-month schedule delay resulting from stop work actions issued in 1982 and a three-month delay following fuel load in 1986. In addition to challenging this determination on various grounds, the parties to this appeal challenge the method utilized by the Commission in quantifying the unreasonable costs associated with these delays.

#### 1. 1982 STOP WORK ACTIONS

In 1981 and 1982, Illinois Power issued a number of stop work action orders (SWAs), temporarily halting various aspects of Clinton construction. SWAs are used as a mechanism to control construction activities when significant problems are discovered. Some of these SWAs required concurrence from the Nuclear Regulatory Commission (NRC) before they could be lifted. Six SWAs issued in 1981 and 1982

did not require NRC concurrence before they were lifted. Two SWAs issued in 1981 and 10 SWAs issued in 1982 required NRC concurrence before they could be lifted. These SWAs were issued in the period from February 1981 to August 1982. At issue before the Commission was whether these SWAs resulted in any unreasonable schedule delays and other unreasonable costs. As with the Mark III containment issues, the evidence on SWA issues was voluminous and often contradictory.

TR/NW found that Illinois Power was responsible for management shortcomings which led to the major 1982 SWAs and that quality assurance (QA) deficiencies on the part of the "constructor," Baldwin Associates, contributed to the breakdown in the management process. Most of the major SWAs issued in 1982 related to heating, ventilation and air conditioning work (HVAC) and electrical work.

The HVAC work was performed by Zack Company. TR/NW found that Zack QA problems were known and documented prior to the issuance of the 1982 SWAs. In fact, the inadequacies in the Zack QA program were known as early as 1978. TR/NW concluded that if Illinois Power and Baldwin Associates had responded in an appropriate manner, the HVAC SWAs might have been avoided. TR/NW found that the recurring problems with the Zack QA program delayed the lifting of the HVAC related SWAs until December 1983.

TR/NW also found that problems with Baldwin Associates' electrical QA program were known and documented prior to the issuance of the 1982 SWAs. These SWAs might also have been avoided had Illinois Power and Baldwin Associates responded in an appropriate manner.

In addition, TR/NW reviewed nonconformance reports, NRC systematic assessment of licensee performance reports, and NRC inspection and enforcement reports. TR/NW found that numerous audit findings of the Clinton QA organization, as well as those of the NRC, had identified the QA and construction documentation deficiencies which led to the 1982 SWAs several years in advance of those SWAs. TR/NW concluded that Illinois Power's management was deficient in not recognizing and correcting the problems earlier. Therefore, Illinois Power was responsible for the resulting SWAs.

In its phase I report, TR/NW concluded that the 1982 SWAs caused an 18-month delay in the Clinton schedule and that Illinois Power was responsible for a minimum of 12 months. TR/NW indicated that the remaining six months of delay were the result of a series of actions by both Illinois Power and the NRC. In the phase II report, TR/NW concluded that Illinois Power was responsible for 12

months of SWA impact and that the remaining six months were caused by changing requirements of the NRC and lack of specific direction from the NRC on requirements for lifting the SWAs. TR/NW determined that the 1982 SWAs resulted in unreasonable costs of $248.4 million attributable to the schedule delay, $56.6 million in unreasonable costs associated with a recovery plan, and a $42 million productivity impact.

MHB also determined that Illinois Power was responsible for the 1981-1982 SWAs. However, MHB disagreed with TR/NW on the method for determining the duration of the schedule delay. TR/NW utilized a critical path analysis. The critical path in a project is a sequence of activities which defines the longest path through the schedule, and thus the minimum total project duration. MHB used three methods: the Clinton construction rate method, the industry average rate method, and the schedule constraints method. Using these methods, MHB concluded that the SWAs delayed construction of Clinton by 14 to 18 months. For purposes of assessing the cost impact of the SWAs, MHB estimated that the delay was 15 months. MHB concluded that the total amount of unreasonable costs attributable to construction QA problems was $793 million.

Illinois Power took the position that no unreasonable costs were incurred as a result of the SWAs. Illinois Power presented the testimony of Burns & Roe Company (BRC). BRC criticized the factual basis upon which TR/NW and MHB relied in reaching their findings and conclusions. BRC indicated that Illinois Power's actions must be viewed in light of the changing QA regulatory environment following Three Mile Island.

Concerning the SWAs, the Commission concluded in pertinent part:

> "The assertion of [Illinois Power's] witnesses that [Illinois Power] was not responsible for any of the delay associated with the SWA's [sic] defies belief in light of the numerous management deficiencies identified in the record. The Commission accepts TR/NW's critical path analysis which showed that the Clinton schedule was delayed a total of 18 months due to the SWA's [sic]. The evidence establishes that [Illincis Power] management shortcomings caused the issuance of the major SWA's [sic] in 1982. Therefore, the Commission concludes that [Illinois Power] is responsible for the entire 18 month delay. The Commission finds that the evidence does not establish that the costs associated with the 18 month delay were reasonably incurred. Therefore, those costs should not be recovered from ratepay-

ers. The Commission accepts TR/NW's quantification of the recovery plan impact and productivity impact associated with the SWA's [*sic*]."

■ On appeal, Illinois Power contends the Commission's finding that the major 1982 SWAs were caused by Illinois Power management shortcomings was not supported by substantial evidence. Illinois Power argues that the evidence showed that the QA/QC program at Clinton was reasonably managed and that the problems cited by TR/NW and MHB were of low severity, were corrected prior to the issuance of the 1982 SWAs and did not indicate any widespread QA/QC programmatic breakdown. Illinois Power also contends that the Commission failed to take into account the changing regulatory environment. In sum, Illinois Power is asking this court to substitute our judgment for that of the Commission on questions of fact. This we will not do. It was within the Commission's authority to accept or reject the testimony of the various expert witnesses. We find the Commission's determination that Illinois Power's actions caused the issuance of the 1982 SWAs was supported by substantial evidence in the record.

Illinois Power also contends the Commission's finding that Illinois Power was responsible for the entire 18-month delay was not supported by substantial evidence. Illinois Power argues the finding is contrary to the conclusions of the independent audit conducted by TR/NW. TR/NW concluded that Illinois Power was responsible for 12 months of the delay and that the remaining six months were caused by changing NRC requirements and lack of direction from the NRC on requirements for lifting the SWAs.

The Commission contends that as an expert body, it is free to accept or reject the recommendations and conclusions of the independent auditor. The Commission argues that the SWAs caused an 18-month delay in the Clinton project and that Illinois Power's unreasonable actions resulted in the SWAs. Therefore, the Commission contends Illinois Power was responsible for the entire 18-month delay.

We conclude that as an expert body, the Commission acted within its discretion in determining that Illinois Power was responsible for the entire 18-month delay, and that its determination was supported by substantial evidence.

In addition, Illinois Power challenges the Commission's determination that there was $98.6 million in unreasonable costs incurred as a result of an impact on productivity, and implementation of a "recovery plan" in response to the 1982 SWAs. In support of its contention,

Illinois Power cites the testimony of its auditors and other expert witnesses which contradicted TR/NW findings on this issue. Again, it was within the Commission's authority to weigh the conflicting evidence on this issue in reaching its determination. We will not accept the invitation to reweigh the evidence. On review of the record, we find the Commission did not err as a matter of law in finding these costs to be unreasonably incurred. We find the Commission's determination was supported by substantial evidence.

### 2. AVOIDABLE THREE-MONTH SCHEDULE DELAY

On September 29, 1986, the NRC issued an operating license permitting Illinois Power to load fuel and conduct low power testing. Initial criticality was achieved on February 27, 1987. Before the Commission, MHB Technical Associates asserted that Illinois Power was responsible for an avoidable three-month pre-fuel load schedule delay. On the other hand, TR/NW found that Illinois Power's actions caused an avoidable three-month schedule extension during the period between fuel load and initial criticality (post-fuel load). The Commission rejected MHB's assertion of a pre-fuel load delay, and accepted TR/NW's finding of a post-fuel load schedule extension. Both the Attorney General and Illinois Power challenge the Commission's findings on these issues.

MHB testified that Illinois Power's ineffective management of several areas of the Clinton project between March 1985 and September 29, 1986, caused an avoidable three-month schedule delay. MHB concluded that the pre-fuel load schedule delay resulted in avoidable costs of $149 million. MHB noted that this amount represented the actual costs incurred during the three months prior to fuel load. In reaching its conclusions, MHB did not perform an independent critical path analysis.

The Commission rejected MHB's contention, finding that without the critical path analysis, acceptance of MHB's allegation of a pre-fuel load schedule delay would require "a leap of faith which the Commission [was] not prepared to take." The Commission noted that while both MHB and TR/NW found management deficiencies prior to fuel load, TR/NW's critical path analysis indicated that these deficiencies contributed to a three-month delay after fuel load. The Commission concluded that there was affirmative evidence in the record showing no avoidable delay in 1986 prior to fuel load.

On appeal, the Attorney General argues the Commission's finding on this issue is erroneous and contrary to the evidence. The Attorney General contends the Commission erred in rejecting MHB's

assertion on the grounds that MHB did not perform a critical path analysis. The Attorney General argues that under *People ex rel. Hartigan v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 120, 510 N.E.2d 865, a critical path analysis is not a prerequisite to a finding of unreasonableness. However, *Hartigan* does not require the use of any particular method of cost impact analysis. The Commission has the discretion to view the various methods introduced by the parties, and choose, in light of the evidence presented, the method the Commission deems the most appropriate.

 TR/NW presented evidence that there was no three-month pre-fuel load delay. The Commission found the evidence presented by TR/NW to be more credible. We cannot say as a matter of law that the Commission erred in rejecting MHB's assertion. We find the Commission's determination that there was no pre-fuel load delay was supported by substantial evidence.

 TR/NW presented evidence that a number of avoidable problems in the aggregate caused a three-month post-fuel load schedule extension. TR/NW concluded that the unreasonable costs associated with the three-month delay totaled $112,100,000. Illinois Power presented evidence to support its position that no avoidable schedule delay occurred. The Commission concluded that with so many management deficiencies documented in the record, Illinois Power's contention that there was no delay was not credible. The Commission adopted TR/NW's critical path analysis which found that a series of actions on the part of Illinois Power in 1985 and 1986 caused a three-month post-fuel load schedule extension.

On appeal, Illinois Power argues the Commission's conclusion was not supported by substantial evidence and failed to consider the changing regulatory requirements taking place in 1985 and 1986. Again, the Commission was presented with conflicting evidence. It found the evidence presented by TR/NW more credible than the evidence presented by Illinois Power. In light of the record presented, we cannot say the Commission erred as a matter of law in accepting the conclusions of TR/NW that an avoidable three-month post-fuel load schedule extension occurred.

3. QUANTIFICATION ISSUES

 The parties disagreed on the appropriate method for quantifying the unreasonable costs incurred in the construction of Clinton. The Commission accepted TR/NW's method of quantifying the unreasonable costs, except for the quantification of the amount of allowance for funds used during construction (AFUDC) associated with avoid-

able schedule delays. The Commission adopted staff witness Judith Marshall's adjustments to TR/NW's calculation of the AFUDC portion of unreasonable costs associated with avoidable schedule delays. This added an additional $128,512,000 to the amount of unreasonable costs recommended by TR/NW.

With regard to the unreasonable costs associated with the 1982 stop work actions, the Attorney General contends the Commission erred in adopting TR/NW's method of identifying and quantifying these costs. The Attorney General maintains that adoption of TR/NW critical path analysis was erroneous because it fails to consider unreasonable costs not on the critical path. The Attorney General contends the method utilized by MHB, with modifications to take into account Marshall's AFUDC calculations, was the proper method of quantification.

The Commission rejected MHB's methodology for quantifying unreasonable costs because MHB did not "provide a sufficient basis for the derivation of its recommended disallowances." Adoption of the TR/NW methodology over the method presented by MHB was within the province of the Commission. We find no merit to the Attorney General's argument that adoption of the TR/NW methodology effectively shifted the burden of demonstrating reasonableness to the intervenors in violation of *People ex rel. Hartigan v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 120, 510 N.E.2d 865. We cannot say as a matter of law that the Commission erred in adopting the TR/NW's methodology over that presented by MHB.

For its part, Illinois Power contends the Commission erred in adopting Marshall's methodology for calculating the AFUDC portion of unreasonable costs associated with avoidable schedule delays. Under AFUDC accounting principles, a utility is allowed to capitalize the cost of financing construction during the construction period. AFUDC represents the time value or cost of money. After construction is completed, the accumulated AFUDC is recovered from ratepayers as part of the depreciation expense. Under the end-of-period AFUDC method recommended by Marshall, unreasonable costs associated with avoidable delays include the amount of AFUDC associated with the unreasonable direct and indirect costs from the date the costs were incurred through completion of the project or the date on which any general delay adjustment is begun, plus the amount of AFUDC incurred on the entire project during the final additional months added to the project by avoidable general schedule delays.

In the instant case, the Commission found there were 21 months of avoidable schedule delays attributable to Illinois Power's unreason-

able actions (18 months associated with 1982 SWAs plus a three-month avoidable post-fuel load schedule extension). Completion of the Clinton project was therefore unreasonably delayed by 21 months. Marshall recommended that the last 21 months of AFUDC be deducted from rate base as unreasonable costs.

Illinois Power argues the Commission's quantification determination was arbitrary and not supported by substantial evidence. On appeal, Illinois Power basically raises the same arguments it made before the Commission. Illinois Power contends that the Marshall methodology is flawed and overstates the impact of schedule delays. Illinois Power also asserts that the Commission erred in rejecting both of the quantification methodologies presented by its expert witness.

Illinois Power presented the testimony of its expert Peterson & Co. (P&C). P&C maintained that Marshall's AFUDC methodology was flawed because it failed to take into account the fact that in order to complete Clinton at an earlier date, many project expenditures would have been made much earlier than they were actually made. P&C requantified the AFUDC associated with the schedule delays in a manner which P&C maintained corrected the deficiencies in the Marshall approach.

P&C also presented a second quantification method referred to as the revenue requirements method. The revenue requirements method compares the present value revenue requirements based upon events as they actually occurred to the present value revenue requirements which would have been borne absent the schedule extension.

The Commission rejected the revenue requirements method, finding that it was subject to "manipulation due to the plethora of subjective assumptions over an extended period of time." The Commission concluded that based on the evidence, Marshall's end-of-period AFUDC method produced the most reliable quantification determination.

In *People ex rel. Hartigan v. Illinois Commerce Comm'n* (1990), 202 Ill. App. 3d 917, 561 N.E.2d 711, the court stated that the end-of-period AFUDC method was a recognized form of quantification analysis. Illinois Power's contentions in this case do not appear to refute that conclusion. However, Illinois Power appears to be arguing that the Marshall method was not supported by substantial evidence because Illinois Power's expert witness criticized the results of the method's application and that, therefore, the Commission erred in rejecting the methods proposed by Illinois Power's expert. We find this argument to be without merit. The Commission received testimony

concerning various proposed quantification methods and criticisms of those methods. The Commission evaluated the different methods and determined that Marshall's method produced the most reliable results based on the evidence. On review of the record, we cannot say as a matter of law that the Commission erred in utilizing the end-of-period AFUDC methodology. We find the Commission's decision was not arbitrary and was supported by substantial evidence.

C. ALLOCATION OF UNREASONABLE COST BETWEEN ILLINOIS POWER AND SOYLAND POWER COOPERATIVE

As originally agreed in 1976, Soyland Power Cooperative and Western Illinois Power Cooperative (the Co-ops) were to pay 20% of the direct cost of constructing Clinton in return for a 20% ownership interest in the facility. On October 5, 1984, the Co-ops and Illinois Power entered into a number of agreements, including one referred to as Amendment No. 6. Amendment No. 6 provided that the Co-ops' investment in Clinton was capped at $450,000,000, and that the respective ownership shares of the Co-ops and Illinois Power in the project would be adjusted to reflect the ratios between their respective contribution to the direct cost and the total direct costs incurred. As a result, as of March 30, 1989, Illinois Power's ownership share of the Clinton project was 86.58%. The Commission determined that Illinois Power was prudent in entering into Amendment No. 6.

The Commission concluded that $712,248,000 in Clinton construction costs were unreasonable. In light of the fact that Illinois Power's ownership share of Clinton was 86.58%, the Commission determined that Illinois Power's share of the unreasonable costs was $665,729,000 (86.58% of the $346,640,000 in unreasonable direct costs plus the total unreasonable AFUDC costs of $365,608,000).

OPC/CUB challenge this allocation of unreasonable costs between the co-owners as not supported by sufficient findings and analysis in the order to support judicial review. OPC/CUB contend that the Commission expressed no reason for its decision to make this allocation. OPC/CUB maintain that the allocation simply appears in the calculation of Illinois Power's share of the prudent and reasonable costs of Clinton. OPC/CUB request that this portion of the order be remanded pursuant to section 10—201(e)(iii) of the Act (Ill. Rev. Stat. 1989, ch. 111⅔, par. 10—201(e)(iii)), and that the Commission be ordered to make further necessary findings and analysis on this issue.

Under section 10—110 of the Act, the Commission is required to "make and render findings concerning the subject matter and facts inquired into and enter its order based thereon." (Ill. Rev.

Stat. 1989, ch. 111⅔, par. 10—110.) The Commission is required to make findings of fact upon the principal issues in the case, and such findings must be sufficiently specific to enable a court to intelligently review the decision of the Commission and ascertain whether the facts found afford a reasonable basis for the order entered. (*Brinker Trucking Co. v. Illinois Commerce Comm'n* (1960), 19 Ill. 2d 354, 166 N.E.2d 18.) The Commission, however, is not required to make particular findings as to each evidentiary fact or claim. *United Cities Gas Co. v. Illinois Commerce Comm'n* (1970), 47 Ill. 2d 498, 265 N.E.2d 608.

In the instant case, the Commission found that Amendment No. 6 was prudently entered into and set forth the effect on ownership shares resulting from the amendment. The Commission then proceeded to allocate the unreasonable direct costs in proportion to the co-owners' respective ownership interest. We find the order contains findings sufficiently specific to enable this court to intelligently review the Commission's decision on this issue. We therefore find no merit to OPC/CUB's contention that this portion of the order must be remanded for further findings and analysis.

V. ACCOUNT 186

Pursuant to earlier Commission orders, Illinois Power was allowed to record certain costs in a deferred assets account designated Account 186. These costs were to be incurred during the period between the in-service date of Clinton (April 24, 1987) and the date on which rates became effective pursuant to the rate order in these proceedings. This period is known as the "regulatory lag" period. One of the items Illinois Power was allowed to record in Account 186 was financing costs on Clinton investment. This cost is similar to the financing costs a utility may record as AFUDC during the period of actual construction.

Commission staff accountant George Henton recommended that the common equity return accumulated in Account 186 after December 31, 1987, be removed for ratemaking purposes. Henton made this recommendation on the basis that under the provisions of the Statement of Financial Accounting Standards No. 92 (SFAS 92) Illinois Power could not, as of January 1, 1988, capitalize for financial reporting purposes the equity component of the financing cost accrued on the deferred post-construction costs recorded in Account 186. The Commission adopted Henton's recommendation and concluded that the Account 186 balance was to be reduced by $101,644,000.

On appeal, Illinois Power contends, *inter alia*, that the Commis-

sion's decision on this issue is wrong as a matter of law.

Paragraph 9 of SFAS 92 provides: "If an allowance for earnings on shareholders' investment is capitalized for ratemaking purposes other than during construction or as part of a phase-in plan, the amount capitalized for ratemaking purposes shall not be capitalized for financial reporting."

Illinois Power argues that SFAS 92 only limits capitalizing such costs for financial reporting purposes, not for ratemaking purposes. We agree. The paragraph states that *if* these types of costs are capitalized for ratemaking purposes, then the amount of those costs shall not be capitalized for financial reporting purposes. By its terms, SFAS 92 contemplates that such costs may be capitalized for ratemaking purposes. SFAS 92 governs the financial reporting treatment of such capitalized costs, not whether such costs can be capitalized for ratemaking purposes.

Because we find the Commission misapplied SFAS 92, we reverse the Commission's determination that the Account 186 balance must be reduced by $101,644,000.

We note that Illinois Power also raises the issue of the effect on recovery of depreciation and taxes other than income taxes also recorded in Account 186 resulting from the Commission's used and useful determination. Because of our disposition of the used and useful issue, we need not address this contention.

## VI. OTHER ISSUES

OPC/CUB contend the Commission erred in refusing to supply certain work papers to the intervenors in a manner which would allow them to review and comment on the hearing examiner's proposed order and the Commission's final order. OPC/CUB maintain their request was limited to the "mechanics for calculating revenue requirements." We note that after OPC/CUB's application for rehearing was denied, the Commission apparently provided the requested information. Since the order is remanded for further determination of the used-and-useful-issue, and this will entail recalculation of the revenue requirements, we find it unnecessary to decide this issue.

In addition, we find that our disposition of the used-and-useful-issue renders it unnecessary for us to address Illinois Power's contention that the Commission's decision does not allow Illinois Power to maintain an adequate level of financial integrity. For the same reason, we need not at this time address the Attorney General's challenge to the method of allocating revenue increases, and OPC/CUB's contention that the Commission erred in its treatment of the accumulated

deferred income taxes and depreciation reserve associated with the non-used-and-useful portion of Clinton.

VII. CONCLUSION

For the reasons stated in this opinion, we find that the Commission erred in using the needed and economic benefits tests in determining whether and/or what portion of Clinton is used and useful. Therefore, we reverse and remand this portion of the Commission's order for further proceedings on the issue of whether and/or what portion of Clinton is used and useful. This determination is to be based on established pre-1986 standards. In addition, we reverse the Commission's decision to reduce, for ratemaking purposes, the Account 186 balance by $101,644,000. In all other respects, the Commission's decision is affirmed.

Affirmed in part; reversed in part and remanded in part for further proceedings consistent with this opinion.

GORMAN and SLATER, JJ., concur.