THE CITY OF CHICAGO *et al.*, Plaintiffs-Appellants, v. THE ILLINOIS COMMERCE COMMISSION, Defendant-Appellee (Commonwealth Edison Company, Intervening Defendant-Appellee).

First District (1st Division)  Nos. 83—1544, 83—2767 cons.

Opinion filed May 13, 1985.

Neil F. Hartigan, Attorney General, of Springfield, James D. Montgomery, Corporation Counsel, Shea, Rogal & Associates, Ltd., Stefan H. Kerieger and Randall D. Schmidt, both of Edwin F. Mandel Legal Aid Clinic, and Pope, Ballard, Shepard & Fowle, Ltd., all of Chicago, and Wayne L. Emery and Kenneth R. Pepperney, both of Pittsburgh, Pennsylvania (Jeff Paulson and Stephen J. Moore, Assistant Attorneys General, of Chicago, and Gerald W. Shea, Ira A. Rogal, and Robert N. Hutchinson, of counsel), for appellants.

Neil F. Hartigan, Attorney General, of Springfield (Hercules F. Bolos and E. King Poor, Special Assistant Attorneys General, of Chicago, of counsel), for appellee Illinois Commerce Commission.

Richard G. Ferguson, Laurence D. Lasky, Paul M. Murphy, and Karl B. Anderson, all of Isham, Lincoln & Beale, of Chicago, for appellee Commonwealth Edison Company.

JUSTICE BUCKLEY delivered the opinion of the court:

The present appeals arise out of interim and permanent rate increases granted to Commonwealth Edison Company (Edison) by the Illinois Commerce Commission (Commission). On January 8, 1982, Edison filed revised tariffs with the Commission reflecting an $805 million annual increase in rates charged to its customers. Edison also requested that approximately one-half of the proposed increase go into effect immediately on an interim basis pending a final decision by the Commission on the permanent increase. Following hearings on the propriety of granting the interim rate request, the Commission

granted Edison interim rate relief of $324 million. Subsequently, the Commission held hearings on the request for permanent rate relief and issued a final order granting Edison a $660.7 million permanent increase. The Commission also reviewed the interim rate increases in its final order and found they were not excessive. At various stages in the proceedings before the Commission, the following parties intervened in order to oppose Edison's requested increases: the People of the State of Illinois (People); the South Austin Coalition Community Council (SACC); the City of Chicago (city); and United States Steel Corporation (U.S. Steel). Pursuant to section 68 of the Public Utilities Act (Ill. Rev. Stat. 1983, ch. 111⅔, par. 72), 11 parties, among them the previously mentioned intervenors before the Commission, filed separate actions in the circuit court appealing the final order of the Commission. The cases were consolidated, and Edison was granted leave to intervene as a defendant. Several plaintiffs moved for stays of the Commission order or, in the alternative, for an order making continued collection of the increased rates subject to refund. The trial court denied these requests and the movants perfected interlocutory appeals to this court. Prior to the resolution of these interlocutory appeals, the trial court affirmed the Commission order on the merits. All plaintiffs appealed from this decision, with the People, SACC, the city, and U.S. Steel filing briefs with this court. The separate appeals from the final order of the trial court and the previous interlocutory appeals have been consolidated for review in the present opinion.

The numerous issues raised by plaintiffs on appeal may be broken down into four categories: (1) there are those issues contesting the utility's revenue requirements or the amount of the permanent increase; (2) there are those issues challenging the rate design which address the question of how the increase should be allocated among the different customer classes; (3) there are those contentions pertaining to the issuance and review of the Commission's interim rate order; and (4) there are those issues relating to the trial court's denial of the stay order initially raised in the interlocutory appeals. We affirm the judgment of the trial court upholding the rate increase granted by the Commission in its entirety. With respect to the interlocutory appeals, we also affirm the trial court's judgment refusing the requested stay.

In reviewing orders of the Commission, Illinois courts exercise a limited statutory jurisdiction under section 68 of the Public Utilities Act (Ill. Rev. Stat. 1983, ch. 111⅔, par. 72). The section provides that findings of the Commission are *prima facie* true and cannot be set aside on appeal unless clearly against the manifest weight of the evi-

dence. Cases construing this statutory standard have held that decisions of the Commission are "entitled to great weight as being the judgment of a tribunal appointed by law and informed by experience" (*Village of Apple River v. Illinois Commerce Com.* (1960), 18 Ill. 2d 518, 523, 165 N.E.2d 329); that "deference to the judgment of the Commission is especially appropriate in the area of fixing rates" (*Iowa-Illinois Gas & Electric Co. v. Illinois Commerce Com.* (1960), 19 Ill. 2d 436, 442, 167 N.E.2d 414); that this deference is required because the fixing of rates is a legislative function delegated to the Commission, not a judicial function (*Illinois Bell Telephone Co. v. Illinois Commerce Com.* (1973), 55 Ill. 2d 461, 469-70, 303 N.E.2d 364); and that the setting of just and reasonable rates "is necessarily a question of sound business judgment rather than one of legal formula" (*Produce Terminal Corp. v. Illinois Commerce Com.* (1953), 414 Ill. 582, 590, 112 N.E.2d 141). Accordingly, "the statute does not authorize a court to put itself in the place of the Commission and to determine independently the issues presented, or to substitute its judgment for that of the Commission." (414 Ill. 582, 589.) Rather, judicial review is limited to determining (1) whether the Commission stayed within the scope of its statutory authority, (2) whether the Commission made findings adequate to support its decision, (3) whether the findings have substantial evidentiary support in the record, and (4) whether constitutional rights have been infringed by the Commission's decision. (*Illinois Bell Telephone Co. v. Illinois Commerce Com.* (1973), 55 Ill. 2d 461, 469, 303 N.E.2d 364.) It is against this backdrop that we must analyze the contentions of the various plaintiffs in the present consolidated appeals.

■ We will first address those issues attacking the amount of the permanent increase as unreasonable and not supported by substantial evidence. The plaintiff city raises three such accounting issues, contending: (1) there is no support in the record to justify the Commission's use of a 6% inflation rate for oil inventories; (2) the Commission's allowance of property held for future use in Edison's rate base is contrary to the manifest weight of the evidence; and (3) the Commission's failure to adopt the city's recession and weather adjustment is arbitrary and contrary to the manifest weight of the evidence. After reviewing the record, we believe the Commission's findings on these issues are supported by substantial evidence. Accordingly, we reject the city's contentions.

With respect to oil prices, the Commission found that "based on the 1982 inflation rate of approximately 6% as shown in government statistics the Commission is of the opinion that oil prices should be

calculated at a 6% inflation rate beginning with April 1982." The city and staff of the Commission each presented witnesses who testified that fuel prices would not rise during 1983 and therefore no increase in fuel prices should be allotted. Edison's fuel price expert testified that a 9% increase for fuel prices was a more realistic forecast. A recognized independent forecasting firm had predicted fuel prices would rise faster than the rate of inflation for the period of 1982 to 1995. In order to resolve this dispute among the expert witnesses on the appropriate fuel escalation rates, the Commission opted for the 6% rate based on testimony from a staff witness that 6% was the appropriate inflation rate. We believe that the Commission's 6% rate for fuel costs is within the range of evidence presented and thus well within its discretion. Accordingly, we reject the city's first contention.

The city also asserts that the Commission's decision to include in rate base property held for use as a future site of the Langham coal-fired generating station was contrary to the manifest weight of the evidence. In support of its position, the city contends the Commission was required to disregard the evidentiary showing that the site will be so used and apply a rule of thumb used by the Commission in previous years to automatically exclude any and all property from rate base if it was not scheduled to be placed in service within 10 years.

"Property held for future use" refers to a utility's investment in property which is not currently being used to provide service to its customers but which will be used in the future to provide such service. The question then arises whether such property should be included in rate base, thereby allowing the utility to earn a return on property not currently being used to provide service. The Commission had previously adopted a policy where property for future use would be included in rate base if it would be in service within 10 years. The city contends that since the Langham site had a scheduled in-service date of 1996, a date more than 10 years from the issuance of the Commission's order, it should not have been included in rate base.

■■ Initially, we note that decisions of the Commission are not *res judicata. (Mississippi River Fuel Corp. v. Illinois Commerce Com.* (1953), 1 Ill. 2d 509, 513, 116 N.E.2d 394.) "The concept of public regulation includes of necessity the philosophy that the commission shall have power to deal freely with each situation as it comes before it, regardless of how it may have dealt with a similar or the same situation in a previous proceeding." (1 Ill. 2d 509, 513.) Thus, like other administrative agencies, the Commission is free to change its standards so long as such changes are not arbitrary and capricious. See also *Montana Power Co. v. Environmental Protection Agency* (9th

Cir. 1979), 608 F.2d 334, 347 (agency not absolutely bound by prior determinations, but may adjust policies in light of experience).

■ Here, the Commission rejected its 10-year standard and focused instead on the nature of the investment. The Commission found that Edison's investment in the Langham site was reasonable and the property should be retained; that a significant lead time was required between acquisition of a plant site and plant completion; and that long-range planning was necessary. We believe the Commission's approach is consistent with decisions from other jurisdictions addressing the issue of whether property held for future use should be included in rate base. (See *Petition of New England Telephone & Telegraph Co.* (1949), 115 Vt. 494, 506, 66 A.2d 135, 142-43 (question is whether purchase of property for future use is a reasonable business judgment with a definite plan); *State ex rel. Pacific Telephone & Telegraph Co. v. Department of Public Service* (1943), 19 Wash. 2d 200, 228-29, 142 P.2d 498, 513 (real estate permitted in rate base where purchase made in good faith with reasonable expectation that it would be improved).) A utility is entitled to earn a return on its investment in property held for future use if the property was acquired in good faith with a definite plan for its use and it is reasonably acquired and retained to serve the utility's customers. (*Southern Bell Telephone & Telegraph Co. v. Public Service Com.* (S.C. 1978), 270 S.C. 590, 600, 244 S.E.2d 278, 283-84.) Here, the Commission properly concluded that prudent investment required long-range planning and acquisition of a plant site more than 10 years from the plant's scheduled completion date. Accordingly, the Commission's decision to include the Langham site in rate base was not contrary to the manifest weight of the evidence where the investment was reasonable and a definite plan for development existed.

■ Next, the city contends that the 1983 revenue projections by Edison reflected our "recessionary times" and that Edison's sales predictions were too low. The city argues that the Commission should have adopted the testimony of its own witness, who proposed a higher forecast based on what he claimed to be the more normal weather and economic conditions during the period of 1975 to 1979.

In order to determine the reasonableness of the new rate set by the Commission, it was necessary to estimate how much revenue the rate will generate. The more a rate will produce in terms of revenue, the less it needs to be raised to meet expenses. Here, the Commission heard conflicting forecasts on the amount of revenue generated by a given rate increase and rejected the testimony of the city's witness as speculative. Edison presented evidence that rebutted the charge that

its sales forecasts were too low and set forth estimates of what its sales would be. The Commission adopted the forecasts of Edison as more persuasive. Thus, the Commission's decision is supported by the record since it involves the resolution of a dispute among experts which is well within the Commission's authority. Accordingly, we reject the city's contention to the contrary.

The People raise one final accounting issue relating to the amount of the permanent increase granted Edison. The People contend that the Commission unlawfully shifted the burden of proof and deprived the intervenors of an adequate hearing in its consideration of Edison's constructive program. We disagree.

The Commission heard a considerable amount of evidence concerning the desirability of completing Edison's extensive generating plant construction program. It devoted 23 pages of its order to an exhaustive review of all the evidence, including the testimony of seven witnesses appearing on behalf of the People. The Commission found that the benefits to be derived from completion of the construction program far outweighed the costs and that timely completion of the program was in the public interest. Based on its review of the record and the Commission's order, the trial court determined that there was ample evidence in the record to support the Commission's finding.

On appeal, the People do not attempt to challenge the trial court's determination that the Commission's order was supported by substantial evidence. Rather, the People assert that Edison did not, as a matter of law, meet its burden of proof because it did not go forward with its evidence on the construction program until the People had presented testimony challenging the reasonableness of the program. The People contend that Edison's failure to come forward with evidence on this issue during its case in chief amounts to a failure by Edison to establish a *prima facie* case.

The People's argument is based entirely on the erroneous assumption that a utility has the burden of going forward on any and all issues which are conceivably relevant to the reasonableness of its proposed rates. This premise is directly contrary to the overwhelming weight of authority and would place an impossible burden on the utility of anticipating the basis of every intervenor's objection and of coming forward with evidence during its case in chief with respect to each objection.

Once a utility makes a showing of the costs necessary to provide service under its proposed rates, it has established a *prima facie* case, and the burden then shifts to others to show that the costs incurred by the utility are unreasonable because of inefficiency or bad faith. (*Peo-*

*ples Gas Light & Coke Co. v. Slattery* (1939), 373 Ill. 31, 61-62, 25 N.E.2d 482; *Boise Water Corp. v. Idaho Public Utilities Com.* (1976), 97 Idaho 832, 838, 555 P.2d 163, 169.) The fact that the People presented its testimony alleging Edison's construction program was unreasonable before Edison presented evidence rebutting those allegations was simply a reflection of the standard legal presumption of reasonableness on the part of the utility's management. (See also Ill. Rev. Stat. 1983, ch. 111⅔, par. 64 ("no informality in any proceeding or in the manner of taking testimony *** shall invalidate any order *** by the Commission").) Accordingly, we must reject the People's contention that the Commission illegally shifted the burden of going forward with evidence to the intervenors.

■■■ We next address those issues challenging the rate design or allocation of the permanent increase among the different customer classes. The city contends that the increase in the residential customer charge and the increase in the streetlighting rate Edison charges the city are contrary to the manifest weight of the evidence. U.S. Steel contends that rates for industrial and commercial customers are not reasonably related to the cost of service and result in unreasonable and discriminatory subsidies to residential customers.

Edison's proposed annual increase represented a 19.4% increase in rates. With some minor exceptions, Edison proposed to spread this increase evenly among the different customer classes. U.S. Steel and other commercial and industrial intervenors argued that Edison's "across the board" approach ran counter to "cost of service" studies which indicate their rates should be lower because it cost Edison less to provide them with service. In order to yield the same amount of revenue, the residential rates would then have to be raised more than 19.4%. The Commission staff agreed that historically industrial customers were charged rates exceeding the cost of servicing them while residential consumers were charged rates below cost. However, the staff proposed that a "cap" of 25% be placed on the amount of increase to residential consumers. In its order, the Commission found that it was desirable to move from rates which in effect subsidized residential consumers to cost-based rates. Accordingly, the Commission concluded that industrial and commercial rates should be lower and residential rates should be higher. The actual rates adopted by the Commission increased charges to residential customers 22% instead of the previously recommended 25%.

U.S. Steel argues that the residential rate increase of 22% is inconsistent with the staff's 25% recommendation and therefore unsupported by the evidence. However, the staff witnesses expressly stated

that if the Commission granted Edison a smaller increase than requested, as ultimately occurred here, the maximum percentage increase to residential customers should be reduced proportionately. Moreover, although class cost of service is the prime criterion the Commission looks at in determining the proper allocation among customer classes, it is not the only criterion the Commission may consider. Section 32 of the Public Utilities Act allows the Commission to consider "other relevant factors." (Ill. Rev. Stat. 1983, ch. 111²/₃, par. 32.) Our supreme court has held that those other relevant factors are not exclusively related to cost factors. (*Citizens Utilities Co. v. Illinois Commerce Com.* (1971), 50 Ill. 2d 35, 41, 276 N.E.2d 330.) Considerations of rate continuity or the desirability of making changes gradually can properly limit changes in rate design. (*International Minerals & Chemicals Corp. v. Mayo* (Fla. 1976), 336 So. 2d 548, 552.) Here, the Commission decided to move gradually toward a more cost-based rate design. The fact that the Commission has not moved as rapidly as U.S. Steel would like is not grounds for reversal. Accordingly, we find the rate design adopted by the Commission on this issue to be consistent with the record, well supported by substantial evidence and within the Commission's informed discretion.

While U.S. Steel complains the residential rates are too low, the city contends they are too high. The typical residential customer of Edison has two charges on his electric bill. One is the "energy charge," which covers the cost for the amount of electricity used and varies from month to month. The other is a flat monthly "customer charge," which covers the fixed costs of supplying the customer with service and does not vary with usage. In the present case, the city claims that the Commission erred in raising the customer charge from $1 to $2 a month. We find little merit in this claim.

The record reveals that the actual fixed cost to Edison for providing service was $4.17 for low-use residential customers and $7.52 for high-use residential customers. Based on this data, the Commission staff proposed an increase in the customer charge to $2.80. The Commission decided to limit the increase to $2 out of "concern for the overall cost recovery of the small residential class" and to limit "the impact of this modification to a level which the Commission considers appropriate." Such a decision is clearly supported by the evidence of record and well within the Commission's discretion.

Finally, the city also challenges the rates for streetlighting, even though the rate on which the city takes service was increased by only half as much as the average increase to all other rates. The city argues that had the Commission adopted the cost of service study advo-

cated by the city's witness, no increase would have been appropriate, and complains at length that the Commission did not accept the testimony of this witness.

Our supreme court's comments in *United Cities Gas Co. v. Illinois Commerce Com.* (1970), 47 Ill. 2d 498, 265 N.E.2d 608, while appropriate for many of the arguments advanced in this appeal, are particularly germane to the city's present contention. "The gist of [appellant's] long, detailed and often technical argument, however, is simply that its witnesses and exhibits are more worthy of belief." (47 Ill. 2d 498, 500.) The city's argument here is no more than a reweighing of conflicting expert opinion that was resolved by the Commission. Contrary to the city's claim, it was not the only one to represent evidence regarding appropriate streetlighting rates. Both Edison and the Commission staff presented evidence regarding the cost of serving streetlighting customers upon which the Commission ultimately relied in setting the appropriate rates. We decline the city's invitation to engage in an extensive reweighing of this highly technical evidence and find that the record contains substantial evidence to support the Commission's decision.

■ Next, we address those issues relating to the interim rate increase granted Edison. SACC contends that the Commission never properly reviewed the interim order after it granted Edison the permanent rate increase and that the interim order was invalid because the Commission never promulgated its interim rate standards pursuant to the Illinois Administrative Procedure Act (Ill. Rev. Stat. 1983, ch. 127, par. 1001 *et seq.*). We disagree.

In order to avoid placing Edison in a position of financial distress, the Commission granted Edison an interim rate increase pending resolution of the permanent rate request. The Commission's authority to grant such interim relief is well established. (*Peoples Gas Light & Coke Co. v. Slattery* (1939), 373 Ill. 31, 42, 25 N.E.2d 482; accord, *Sprague v. Biggs* (1945), 390 Ill. 537, 62 N.E.2d 420.) The interim rates were allowed to go into effect subject to refund should the Commission determine, after reviewing them in its final order on the permanent rates, that they had been excessive or more than just and reasonable. The Commission did review the interim rates in its final order and determined that with respect to streetlighting they had been excessive. With respect to all other customer classes, the Commission determined that the interim rates had not been excessive, and that, with the exception noted above, Edison should not be required to refund amounts collected under them.

SACC argues that the Commission's review of its interim order

was improper because the Commission made insufficiently detailed findings. SACC's basic position is that the findings supported the Commission's review of the interim rate order must be as detailed as those supporting its determination of the proper level of permanent rates. We believe SACC has misconstrued the purpose of the interim rate review.

In reviewing interim rates, the Commission was not obliged to determine precisely what the just and reasonable rates would have been during that period. It was merely obliged to determine that the interim rates were not more than just and reasonable during the period they were in effect. In this case, the latter determination was a far simpler one to make because the evidence clearly showed that the interim rates had been far less than just and reasonable.

The Commission's order set forth evidence of record showing Edison's expenses, revenues, rate base, and rate of return for 1982, the period during which the interim rates were in effect. The rate of return on common equity for this period was 10.74%, whereas Edison's cost of equity was approximately 17.04%. Thus, the Commission found that Edison's cost of equity during this period was far greater than the rate of return it was earning. The shortfall between what Edison earned and what it should have earned during the period was therefore very great.

SACC argues that the Commission's determination was improperly based on the 1983 test year used in setting the permanent rates. The record simply does not support this contention. The Commission's order specifically relied on 1982 data to determine that the interim rates were not excessive when collected. The Commission expressly found that the cost of equity "was much greater than 10.74% (which the interim rates provided) through 1982."[1] All of the evidence on cost of common equity in the case dealt with the cost of common equity in 1982, the very period during which the interim rates were in effect. In the permanent rate hearings, the witnesses all estimated the cost of common equity for 1982 and made the reasonable assumption that, absent some indications to the contrary, this cost would be the same in 1983. Thus, the 17.04% cost of common equity which indicated the rate of return Edison should have been earning was based on 1982 estimates.

■ SACC also argues that the 1982 data relied on by the Commission were inadequate because the Commission did not adjust them by determining whether certain expenses should be excluded for rate-

---

[1]The interim rates were in effect from May 1982 to early December 1982.

making purposes. However, as previously noted, in reviewing its interim order the Commission was not obligated to determine precisely what the just and reasonable rates for the period would have been, but only whether the interim rates then in effect were excessive. The data showed that these rates were far lower than what just and reasonable rates would have been. Based on this evidence, the Commission concluded that further findings adjusting details of the financial data, which would be necessary to determine an exact, just and reasonable rate, were unnecessary for interim rate review, because the disparity between rate of return and cost of equity was so great no adjustments it could reasonably make would result in a finding that the interim rates were excessive. As stated by the Commission: "Even after making an allowance for adjustments the Commission might make to the above financial results in a conventional rate case analysis the Commission finds that the interim rates *** were not excessive." Undoubtedly, the better procedure would have been for the Commission to articulate what adjustments it might make to this data, a procedure we would hope that the Commission would follow in the future. Here, however, because the disparity between return on common equity and cost of common equity was so great, we do not believe the imprecise nature of the Commission's findings mandates reversal of that portion of the Commission's order holding the interim rate increases was not excessive. Accordingly, we hold that the Commission adequately reviewed the interim rate increase and that its findings were supported by substantial evidence.

SACC also contends that the Commission's interim standard is void because it was never promulgated as an agency rule pursuant to section 17 of the Illinois Administrative Procedure Act. (Ill. Rev. Stat. 1983, ch. 127, par. 1017.) However, this section only requires that rules relating to "practice and procedure" be established and promulgated. The section is not applicable to the standards used by an administrative agency in arriving at its decisions.

The issue of whether an agency standard should be cast immediately into the mold of a general rule or whether the agency should proceed on a more informal basis adjusting its standards as the need arises was addressed by the United States Supreme Court in *Securities & Exchange Com. v. Chenery Corp.* (1947), 332 U.S. 194, 91 L. Ed. 1995, 67 S. Ct. 1575. There, the court interpreted a statute with the pertinent provisions essentially the same as our own act and concluded that the choice between proceeding by general rule or by individual *ad hoc* litigation is one that lies in the informed discretion of the administrative agency. (Accord, *NLRB v. Majestic Weaving Co.*

(2d Cir. 1966), 355 F.2d 854.) Accordingly, we believe it is within the Commission's discretion to develop an interim rate standard without promulgating a rule.

In support of its position, SACC cites *In re Northwestern Bell* (S.D. 1982), 326 N.W.2d 100, a decision in which the court held that due process required a commission to promulgate major changes to standards by rule prior to applying them. The South Dakota Public Utilities Commission had applied an entirely new standard, stricter than the statutory "just and reasonable" standard, and denied interim rates to a utility. The court held that such action denied the utility due process by failing to give the utility prior notice of the change. Thus, the issue to be derived from *Northwestern Bell* is whether the Commission so drastically changed its standards as to constitute a denial of due process. SACC cannot claim such lack of notice here. In the Edison interim rate order of November 19, 1980, which was issued just prior to the present interim order, the Commission used an interim standard virtually identical to the one used in the present case. Accordingly, *Northwestern Bell* is not controlling, and the Commission acted within the limits of its discretion in not promulgating its interim standard by a general rule.

■■■ With respect to the interim rate relief, the People also complain that the Commission excluded from the interim phase of the proceeding the testimony of three of its witnesses attacking Edison's construction program. The People contend that the testimony was relevant and that such exclusion violated due process rights, and it requests that this court remand the order to the Commission with directions to receive the evidence in the interim proceeding.

Whether the Commission erred in excluding the testimony in question from the interim phase of the proceeding is plainly moot. The Commission did in fact receive all this testimony in evidence during the hearings on the permanent rate increase and, at the conclusion of these hearings, reevaluated the propriety of granting Edison the interim rate increase. This evidence and other evidence concerning Edison's construction program was discussed at great length in the Commission's final order. The Commission gave detailed reasons for rejecting the conclusions of the People's witnesses. Based upon its review of all the evidence, the Commission found that it was in the public interest for Edison to complete its construction program. Accordingly, it would be pointless to direct the Commission to go back and receive the same evidence in the interim phase of the proceedings, since it would not affect the Commission's decision to grant the interim relief.

■■ Finally, we address those issues raised in the interlocutory appeal. The trial court denied plaintiffs' requests for a stay of the Commission's final order. Plaintiffs contend that they are automatically entitled to a stay pending appeal because they are threatened with irreparable harm as a matter of law. Plaintiffs argue that, under section 71 of the Public Utilities Act (Ill. Rev. Stat. 1983, ch. 111⅔, par. 75), the trial court was required to grant the stay upon a showing of irreparable harm alone.

Underlying this issue is the long-standing rule in Illinois that Commission-set rates are legislative in nature and therefore can only be changed prospectively. Accordingly, there are no refunds to utility customers if a Commission-set rate is overturned as too high, nor can there be retroactive surcharges for the utility if a rate is overturned as too low. (See *Mandel Brothers, Inc. v. Chicago Tunnel Terminal Co.* (1954), 2 Ill. 2d 205, 117 N.E.2d 774.) The plaintiffs contend that this inability to get refunds by itself constitutes irreparable harm and that upon this showing they are entitled to a stay of the Commission's order.

The argument that the unavailability of a refund warrants a stay was addressed in *Cerro Copper Products Co. v. Illinois Commerce Com.* (1978), 65 Ill. App. 3d 764, 767, 382 N.E.2d 143. There, the court reversed the trial court's denial of a stay and held that "payment of a Commission-set rate and the inability to get a refund of any excess payments if the rates are set aside on appeal constitutes great or irreparable injury." (65 Ill. App. 3d 764, 767.) On leave to appeal, our supreme court summarily reversed without an opinion. (*Cerro Copper Products Co. v. Illinois Commerce Com.* (1979), 72 Ill. 2d 581.) Accordingly, the appellate court's decision in *Cerro Copper* may not be used in support of plaintiff's argument.

We believe the construction urged by plaintiffs runs counter to the plain language of section 71. Under the statute, "the pendency of an appeal shall not of itself stay" an order of the Commission and a reviewing court "in its discretion may stay" such orders. If the reviewing court does grant a stay, "the order suspending the same shall contain a specific finding based upon the evidence submitted to the court *** that great or irreparable damage would otherwise result to the petitioner." (Ill. Rev. Stat. 1983, ch. 111⅔, par. 75.) Accordingly, the decision to grant a stay is discretionary with the trial court, and there is nothing in section 71 which would mandate the issuance of a stay upon a showing of threatened irreparable harm alone.

■■ In deciding whether or not to grant a stay of a Commission order, we believe a reviewing court's discretion should be guided by

traditional factors for granting interlocutory injunctive relief. They are: (1) the petitioner's likelihood of prevailing on the merits; (2) the irreparable harm petitioner will suffer if the stay is not granted; and (3) the harm to other parties which would result from the issuance of the stay. (*Kable Printing Co. v. Mount Morris Bookbinders Union Local 65-B* (1976), 63 Ill. 2d 514, 523, 349 N.E.2d 36; *People ex rel. Edgar v. Miller* (1982), 110 Ill. App. 3d 264, 269, 441 N.E.2d 1328.) Our review of the proceedings below reveals that the trial court applied the above mentioned equitable principles and found that plaintiffs had failed to demonstrate they were likely to succeed on the merits. After reviewing the record, we believe the trial court acted within its broad discretionary powers for the grant or denial of such relief, and we therefore affirm the trial court's order denying the request for a stay.

In view of the foregoing, the judgments of the trial court in both the interlocutory and final appeals are affirmed.

Affirmed.

CAMPBELL and O'CONNOR, JJ., concur.