ILLINOIS POWER COMPANY, Appellant, v. ILLINOIS COMMERCE COMMISSION *et al.*, Appellees.—CITIZENS UTILITY BOARD *et al.*, Appellants, v. ILLINOIS COMMERCE COMMISSION *et al.*, Appellees.

Third District   Nos. 3—92—0679, 3—92—0779 cons.

Opinion filed September 10, 1993.—Modified on denial of rehearing January 13, 1994.

Allan Horwich, James P. Gaughan, Jr., and Lisa C. Leib, all of Schiff, Hardin & Waite, of Chicago (Owen E. MacBride, of counsel), for Illinois Power Company.

Nancy Shannon and Carol Brown, both of Office of Public Counsel, of Chicago, for Office of Public Counsel.

Susan L. Satter, of Citizens Utility Board, of Chicago, for Citizens Utility Board.

Roland W. Burris, Attorney General, of Springfield (David W. McGann and John P. Kelliher, Special Assistant Attorneys General, of Chicago, of counsel), for respondent Illinois Commerce Commission.

Jed S. Freeman, of Lueders, Robertson & Konzen, of Granite City (Eric Robertson, of counsel), for respondent Illinois Industrial Energy Consumers.

John P. Meyer, of Law Offices of John P. Meyer, of Danville, for respondent University of Illinois.

JUSTICE BARRY delivered the opinion of the court:

Illinois Power Company (IP) (No. 3—92—0679) and the Office of Public Counsel and the Citizens Utility Board (OPC/CUB) (No. 3—92—0779) appeal from certain orders and decisions of the Illinois Commerce Commission (Commission) relating to IP's request for an increase in electric rates to recover deferred post-construction costs of its Clinton Power Station (Clinton). Specifically, they appeal from:

(1) a February 11, 1992, order requiring IP to file new tariff sheets so the Commission could review the propriety of ratemaking treatment accorded IP's Account 186, wherein IP had recorded between April 24,

1987, and March 30, 1989, the following post-construction charges: (1) depreciation, (2) real estate taxes, (3) associated income taxes, and (4) financing costs of (a) the Clinton investment not previously included in rate base as construction work in progress and (b) the amounts accrued in Account 186;

(2) a March 10, 1992, decision of the Commission denying in part petitions for rehearing filed by IP and CUB and ordering a limited rehearing to reconsider its February 11, 1992, decision (the Commission stated that the purpose of the rehearing was to make, "in light of *BPI II* [*Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1991), 146 Ill. 2d 175, 585 N.E.2d 1032], a determination of the proper ratemaking treatment of Account 186 balances, which would include those balances which were both included in and excluded from rate base by the February 11, 1992 Order, and *** the effect of any Account 186 disallowances on the financial viability of Illinois Power Company");

(3) an order of August 7, 1992, upon rehearing allowing IP to recover $119,553,000 of IP's deferred post-construction costs and decreasing IP's annual electric operating revenues by $21,475,000; and

(4) September 2 and September 25, 1992, decisions of the Commission denying IP's application for rehearing or reconsideration of the February and August orders and denying OPC/CUB's application for rehearing of the August order, respectively.

This action was initiated on March 19, 1991, when IP filed revised tariff sheets with the Illinois Commerce Commission requesting a general increase in electric rates. Petitions for leave to intervene were filed by the board of trustees of the University of Illinois, the office of the Attorney General on behalf of the State of Illinois, the Citizens Utility Board, the Office of Public Counsel and various members of the Illinois Industrial Energy Consumers (IIEC). All of the petitioners were allowed to intervene. At the hearings on IP's proposed rates, in addition to IP and the intervenors, Commission staff (Staff) participated.

Some historical background and explanation of the case is needed to clarify the issues on appeal. This case concerns a lag period of 23 months between April of 1987 and March of 1989. Technically termed a "regulatory lag period," it was that period of time between the completion of construction of the utility's new plant (here, Clinton) and the Commission's entry of a new rate order reflecting the cost of the completed plant. During the regulatory lag period, the utility filed its tariff sheets with the Commission proposing new rates, the Commission conducted an audit, held evidentiary hearings and ultimately issued an order determining the plant's "reasonable cost."

The "deferred post-construction charges" for which IP sought recovery in this case consist of costs incurred by the utility during the regulatory lag period. Because normal accounting procedures would require the utility to stop recording a financing cost on its investment in a separate "AFUDC" account ("Allowance for Funds Used During Construction") and begin depreciating the new plant as of its in-service date, and because retroactive ratemaking is prohibited, the utility assumes that it will experience an adverse financial impact during the regulatory lag period unless an accounting variance is permitted.

Prior to the commencement of this action, IP petitioned the Commission in January 1986 (docket No. 86—0002) for authorization to record depreciation expense for book purposes on the investment in Clinton upon its being placed in operation and, during the regulatory lag period, to record in a deferred asset account (Account 186) an amount equal to: (a) the depreciation expense; (b) the operation and maintenance expense (O&M); (c) taxes other than income taxes associated with Clinton; and (d) a financing cost or carrying charge on any investment in Clinton not already included in rate base. Recognizing that the regulatory lag period in this case could pose a serious financial impact on IP, its cost of capital and its shareholders, the Commission on March 5, 1986, entered its order allowing a departure from normal accounting practices, specifically permitting IP during the regulatory lag period: (a) to record and defer fixed operation and maintenance costs, depreciation and taxes other than income tax; and (b) "to record financing costs on plant investment (including amounts in any deferred asset account) *** to the extent the underlying assets are included in rate base, from the in-service date of Clinton Unit I to the date on which rates become effective pursuant to a rate order which addresses placing Clinton Unit I in service." The Commission further stated:

> "[T]he Commission is not making any determination as to the costs associated with Clinton that are properly includible in IP's rate base. Except as may be ordered by the Commission in a future rate case, the post-construction costs allowed herein to be recorded and deferred should be included in rate base *** and should be recovered under an amortization plan conforming to generally accepted accounting principles applicable to regulated electric utilities."

On January 15, 1987, IP filed another petition with the Commission, docket No. 87—0017 (consolidated with another docket initiated by the Commission, No. 86—405—"Investigation Concerning Proposed In-Service Criteria for Clinton Unit I"), seeking to record as a deferred liability the difference between IP's Federal income tax expense as calculated

under rates set by the Tax Reform Act of 1986 (which reduced IP's income tax) and its Federal income tax expense as calculated under the rates previously in effect. IP proposed to offset the tax expense reduction against depreciation and fixed operation and maintenance expenses that were being recorded in Account 186 as deferred assets pursuant to the Commission's order of March 5, 1986. The IIEC, OPC and others intervened, and on July 23, 1987, reached a settlement with IP, which was proposed to the Commission for approval. The Commission approved the settlement on November 24, 1987. Specifically, the Commission ordered that IP should commence the accounting variance approved in March 1986 as of April 24, 1987, the in-service date for Clinton, and that IP's next rate case should include the impacts of the Tax Reform Act of 1986, which would be prospective only.

On March 30, 1989, the Commission entered an order in dockets Nos. 84—0055, 87—0695 and 88—0256, consolidated. Docket No. 87—0695 was IP's first rate case following completion of Clinton. In that docket IP had proposed that the entire Account 186 balance recorded during the regulatory lag period be included in rate base and that it be amortized over the remaining life of Clinton with the unamortized amounts included in rate base thereby earning a full return. The matter was heard, and ultimately the Commission allowed a rate increase of $60,536,000, or 6.89%. For purposes of consolidated dockets Nos. 84—0055, 87—0695 and 88—0256, the Commission found that IP's share of unreasonable construction costs of Clinton was $665,729,000 (a co-owner of Clinton is Soyland Power Cooperative, which is not regulated by the Commission), and that only 27.2% of Clinton was used and useful. The Commission therefore disallowed a common equity return on the remaining 72.8% of IP's reasonable and prudent investment in the plant. A full return of capital associated with the prudently incurred costs was allowed, as was a full return on the debt and preferred stock associated with such prudently incurred costs.

The Commission's rate order of March 30, 1989, was appealed to this court and resulted in an opinion issued on February 8, 1991, reversing in part the Commission's rate order and remanding for further proceedings to determine "used and useful" under pre-1986 standards. (*Illinois Power v. Illinois Commerce Comm'n* (1991), 208 Ill. App. 3d 779, 792, 566 N.E.2d 1372 (*IP I*).) Our opinion was appealed to the Illinois Supreme Court and found to be in error in *Business and Professional People for the Public Interest v. Illinois Commerce Comm'n* (1991), 146 Ill. 2d 175, 225, 585 N.E.2d 1032 (*BPI II*). Subsequent to *BPI II* the supreme court, in the exercise of its supervisory authority, vacated this court's judgment in *IP I* and remanded the cause to the appellate court

for further proceedings consistent with *BPI II.* (588 N.E.2d 1190-91.) A final disposition of that cause was presented by the parties for our approval on November 6, 1992, and allowed December 2, 1992. Specifically, we ordered:

"(1) the findings and determination of the Illinois Commerce Commission in its order of Mar. 30, 1989 *** that Illinois Power Company's share of the prudent and reasonable cost of Clinton Power Station at December 31, 1987 is $3,136,909,000 is affirmed;

(2) the finding and determination of the [ICC] in the 1989 Rate Order that deferred Clinton Power Station post-construction equity financing cost recorded in Account 186 between January 1, 1988 and March 30, 1989, would not be allowed for ratemaking purposes is reversed, such reversal not being a dispositive determination of the amount of deferred Clinton *** post-construction costs recoverable under [*BPI II*], which issue is before this Court in Case Nos. 3—92—0697 [*sic*] and 3—92—0779;

(3) in all other respects, the appeals *** are dismissed ***; and

(4) this Court's order of July 12, 1989, requiring Illinois Power Company to collect the increased revenues authorized by the 1989 Rate Order 'subject to refund' pending appeal is vacated."

IP's next rate case (docket No. 89—0276) proposed including in rate base the full unamortized Account 186 balances that had been allowed in the Commission's 1989 rate order. The order in docket No. 89—0276 was issued on June 6, 1990, and, as amended, granted IP an annual rate increase of $74,799,000. IP appealed the Commission's use of IP's actual capital structure, rather than IP's proposed target capital structure, in determining the rate of return on common equity. On June 12, 1991, this court affirmed the Commission's decision finding that a 12.25% rate of return based on IP's actual capital structure was reasonable, but remanded for further proceedings consistent with *IP I. (People ex rel. Hartigan v. Illinois Commerce Comm'n* (1991), 214 Ill. App. 3d 222, 229-30, 573 N.E.2d 858 (*IP II*).) On appeal to the Illinois Supreme Court, *IP II* was remanded on a supervisory order for further proceedings consistent with *BPI II* as well. (588 N.E.2d 1192.) The parties subsequently moved to dismiss their appeals in this court, and on October 30, 1992, we granted those motions.

This case (docket No. 91—0147) followed. IP sought recovery of the entire unamortized balance of deferred charges associated with the reasonable cost of Clinton, including the post-1987 deferred equity return which the Commission had disallowed in the 1989 rate order. Ultimately, the Commission disallowed 72.8% of the deferred common equity return from the balance in Account 186 eligible for recovery; disallowed all de-

ferred depreciation and real estate taxes; and applied an "actual harm" test to the remaining balance of deferred costs ($119,553,000) and allowed recovery of that amount. The Commission's orders resulted in a disallowance of approximately $199 million of the recorded deferred post-construction costs.

The issues presented by IP for our review in appeal No. 3—92—0679 are: (1) whether the Commission erred in disallowing deferred post-construction depreciation, real estate taxes and 72.8% of the deferred Clinton post-construction common equity return; (2) whether the Commission erred in applying *BPI II* in determining IP's recovery of deferred post-construction costs; (3) whether the Commission erred in determining the test-year balance of deferred costs; (4) whether the Commission failed to give proper and adequate consideration to maintaining IP's financial viability; and (5) whether the Commission's allowance of a return on common equity of 12.40% was supported by the evidence and based on findings and analysis sufficient to allow informed judicial review. The sole issue presented by OPC/CUB in their appeal No. 3—92—0779, here consolidated, is whether the Commission used an erroneous method for determining the extent of harm resulting from regulatory delay, thereby allowing IP to recover a profit contrary to the dictates of *BPI II*.

I. DISALLOWANCES OF DEFERRED COSTS

IP first argues that the Commission's rate orders in dockets prior to No. 91—0147 and this court's opinion in *IP I* generally approved the deferral and recording of post-construction costs. Thus, IP contends, the Commission and this court authorized the recovery of such costs; and, at least to the extent that deferred post-construction items were not challenged on appeal from the earlier dockets, they should not have been disallowed in this case. Further, even if the Commission did not err in applying *BPI II* to this case, IP continues, *BPI II* does not invalidate Commission action taken to lessen the financial impact of regulatory lag upon IP, because such actions were understood by the parties as superseding general rules or were a valid exception to general rules. IP says that the Commission erred by ruling that it was required to remove test year items, such as accumulated depreciation and real estate taxes, from recoverable deferred costs pursuant to *BPI II*.

For purposes of our review, we are guided by the following standard as explained in *BPI II*:

"[S]etting utility rates is a legislative rather than a judicial function. In the rate-making scheme, the Commission and not the court is the fact-finding body (*People ex rel. Hartigan v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 120, 142[, 510 N.E.2d 865])

(*Hartigan I*). Its findings of fact are to be accepted as *prima facie* true and cannot be set aside on appeal unless they are against the manifest weight of the evidence. (*City of Chicago v. Illinois Commerce Comm'n* (1985), 133 Ill. App. 3d 435[, 439, 478 N.E.2d 1369].) Accordingly, our review of the Commission's orders is limited to determining whether the Commission: acted within the scope of its statutory authority; set out findings of fact adequate to support its decisions; issued findings which were supported by the manifest weight of the evidence; and rendered decisions which do not infringe upon a constitutional right. *City of Chicago*, 133 Ill. App. 3d at 439. See Ill. Rev. Stat. 1989, ch. 111²/₃, par. 10—201(e)(iv)." (*BPI II*, 146 Ill. 2d at 196, 585 N.E.2d at 1039.)

Guided by *BPI II*, we find that IP's position with respect to the recoverability of deferred post-construction charges cannot withstand analysis.

■ First, we reject IP's premise that the law as declared by the court in *BPI II* cannot be applied by the Commission in determining recoverability of the deferred post-construction charges recorded in Account 186. Indeed, the Commission was bound to follow our supreme court's decision to the extent that it addressed the issues in this case and clarified applicable law. Moreover, to the extent the Commission's prior orders or this court's decisions on appeal from such orders conflicted with *BPI II*, such prior orders and decisions were superseded by the decision in *BPI II*. Obviously, prior orders of the Commission allowing IP to record deferred charges during the regulatory lag period in contemplation of recovering them in the rate case were not final as to recovery and had no preclusive effect in the rate case. (*Peoples Gas, Light & Coke Co. v. Illinois Commerce Comm'n* (1988), 175 Ill. App. 3d 39, 51, 529 N.E.2d 671.) Accordingly, we hold that the Commission did not err in applying *BPI II* to the facts of this case and rendering its ultimate determination based on the law as therein stated.

■ Next, we believe it is clear from the Commission's order in docket No. 86—0002 that the Commission was not authorizing recovery of any deferred post-construction costs, but merely approving an accounting variance to alleviate potentially adverse financial consequences during the regulatory lag period. Both the Commission in its March 5, 1986, order in docket No. 86—0002 and our supreme court in *BPI II* distinguished between the recording of deferred post-construction charges and the ultimate decision to include or disallow recovery of such charges in rate base. The decision as to whether any of the deferred charges recorded during the regulatory lag period would be recoverable had to await the filing of the rate case. Then recovery would be permitted in the new rates only insofar as *actual* financial data available for

the lag period established that the utility "actually suffered significant *** financial impact." (Emphasis omitted.) (*BPI II*, 146 Ill. 2d at 236, 585 N.E.2d at 1058.) Thus, until the instant rate case, there was no finality as to the treatment of any recorded deferred charges for purposes of recovery. The Commission had not only the authority to determine the extent to which the utility's recorded deferred charges could be recovered from ratepayers, but the duty to do so according to current law (in particular, *BPI II* in this case), in the rate case seeking recovery of the recorded deferred charges—in this case, docket No. 91—0147. *Relph v. Board of Education of DePue Unit School District No. 103* (1981), 84 Ill. 2d 436, 420 N.E.2d 147.

*BPI II* specifically addressed as well the recoverability of deferred depreciation and found that allowance of such deferred charges violates the Commission's rules and is reversible error. (146 Ill. 2d at 240-41, 585 N.E.2d at 1060.) The fact that the Commission previously allowed deferred depreciation to be recorded pursuant to IP's requests for accounting variances did not effectuate an amendment of test-year rules so as to validate recovery of these charges in the rate case. Thus, we hold that the Commission's decision based on *BPI II* to disallow recovery of deferred depreciation in Account 186 was not error.

■ Similarly, the Commission's decision to disallow deferred real estate taxes should be affirmed. Real estate taxes, no less than depreciation, are clearly test year expenses and cannot be recovered without violating test year principles. *BPI II*, 146 Ill. 2d 175, 585 N.E.2d 1032.

With respect to the Commission's disallowance of 72.8% of IP's deferred return on common equity, we find that *BPI II*'s proscription of allowing a utility to recover more than it would have had the ratemaking decision been synchronized with the plant in-service date justifies the disallowance of that percentage of financing costs recorded in Account 186. In explaining the difference between a rate case and a utility's request for an accounting variance, our supreme court in *BPI II* stated:

> "The purpose of the accounting variance is to protect [the utility] from adverse financial impact caused by the regulatory delay period, and to afford [the utility] the opportunity to recover these charges. The accounting variance should not be used to place [the utility] in a better position than it would have been in had synchronization been achieved. Just as it would be unfair to deny [the utility] recovery of its reasonable and prudent investment due to regulatory delays which the company could not control, so, too, would it be unfair if [the utility] were allowed to reap a windfall, at ratepayer expense, due to a regulatory delay which the ratepayers could not control." 146 Ill. 2d at 247, 585 N.E.2d at 1063.

■ In its 1989 rate order the Commission determined that only 27.2% of Clinton was used and useful. To allow a greater recovery of the Account 186 deferred return on common financing costs would be tantamount to permitting the utility to pass on to its ratepayers the utility's cost of financing unreasonable construction charges. This is precisely the unfair "windfall" the *BPI II* court sought to preclude in imposing the synchronization standard for determining the extent to which recorded, deferred charges may ultimately be included in rate base. Accordingly, we hold that the Commission did not err in disallowing 72.8% of IP's deferred common equity financing costs.

IP contends that the Commission's prior orders allowing the utility accounting variances to protect it from potential adverse consequences of regulatory lag (dockets Nos. 86—0002 and 86—0405/87—0017) "established a clear guideline" for amortization and recovery of IP's deferred costs in the rate case. IP suggests that the Commission's disallowance of charges which it had previously allowed the utility to record in Account 186 was, therefore, arbitrary and capricious and in violation of the prohibition against single-issue ratemaking. We do not agree.

■ At the time of the Commission's orders in dockets Nos. 86—0002 and 86—0405/87—0017, the Commission did not have the benefit of our supreme court's decision in *BPI II*, and the law applicable to the ratemaking treatment of deferred post-construction charges was unclear. Nonetheless, the Commission had previously established its "test year principle" that bases the determination of a utility's revenue requirement on revenues, expenses and investments for a single year. In this case, the test year was the forecasted calendar year ending December 31, 1992. The rule precludes a utility from recovering on an annual basis more than its revenue requirement for the test year, in this case, 1992. The Commission is further bound in its ratemaking determinations by rules prohibiting retroactive and single-issue ratemaking. Significantly, in this case, as in *BPI II*, none of the Commission's orders allowing the utility to record and defer various post-construction charges purported to modify the Commission's rules. The orders approved accounting variances for the regulatory lag period—no more, no less. In docket No. 86—0002, the Commission expressly prefaced its order with the statement that it was *not* making a determination as to costs properly includable in IP's rate base. The Commission stated, "In this proceeding, the Commission is not making any determination as to the costs associated with Clinton that are properly includible in IP's rate base." We thus believe that it could not have been clearer that all parties understood that the accounting variance was being approved for the sole purpose of protecting the utility from any substantial financial harm during

the regulatory lag period, and not for the purpose of setting "guidelines" for includable test year expenses in the rate case. Based on all evidence presented to the Commission in this case, the Commission disallowed recovery of those charges that would have placed IP in a better financial position than it would have been had the ratemaking decision been synchronized with the plant in-service date, and ultimately granted a 7.22% increase in its rates. The Commission's determination was consistent with current law and the Commission's rules. We conclude that the Commission's application of *BPI II* to this case, notwithstanding the Commission's entry of prior orders permitting IP to record deferred post-construction charges that were later disallowed pursuant to *BPI II*, did not result in arbitrary and capricious or single-issue ratemaking.

■ IP next contends that the Commission's action disallowing recorded post-construction charges was confiscatory and in violation of the Illinois and Federal Constitutions. IP's argument in this regard is not well taken. In applying the proper constitutional standard:

> " 'It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unreasonable, judicial inquiry ... is at an end. The fact that the method employed to reach that result may contain infirmities is not then important.' [Citation.] \*\*\* [W]hether a particular rate is 'unjust' or 'unreasonable' will depend to some extent on what is a fair rate of return given the risks under a particular rate-setting system, and on the amount of capital upon which the investors are entitled to earn that return." (*Duquesne Light Co. v. Barasch* (1989), 488 U.S. 299, 310, 102 L. Ed. 2d 646, 658-59, 109 S. Ct. 609, 617, quoting *Federal Power Comm'n v. Hope Natural Gas Co.* (1944), 320 U.S. 591, 602, 88 L. Ed. 333, 345, 64 S. Ct. 281, 288.)

In our opinion, the Commission's ultimate rate decision in this case passes constitutional muster. Inasmuch as we find that the rate of return granted to the utility is based on the evidence presented to the Commission and on applicable law and regulatory rules, we do not find that the 7.22% increase was so unjust or unreasonable as to be confiscatory.

## II. IP'S FINANCIAL VIABILITY

Next, IP argues that the Commission gave inadequate consideration to maintaining the utility's financial viability. IP contends that the Commission erred by denying IP's application for a rehearing of the August order to consider additional evidence on the financial consequences of the Account 186 disallowances. The thrust of IP's argument seems to be that the utility's bond rating with Standard & Poor's should be in the middle of the benchmark range of single A by 1995. IP contends that the

utility was only rated BBB, the lowest investment grade for utilities, at the time of the August order, and that the Commission's decision in the August order to disallow deferred costs that had been previously included in rate base could be "devastating to investor confidence in Illinois regulation."

In our opinion, the Commission gave adequate consideration to IP's evidence of financial viability. The Commission acknowledged the importance of the utility's ability to raise capital by maintaining an investment grade bond rating and expressly weighed this factor in the March 1989 rate order. In the current case, the Commission again heard and considered substantial testimony relating to IP's financial integrity and the potential effects on the stock and bond markets that disallowances of previously authorized deferred costs could cause. In its August 1992 order, the Commission concluded, however, that the disallowances and resulting rates based on *BPI II* "will not significantly impair IP's financial viability. \*\*\* IP's cash flow is more than adequate to meet its expected construction needs \*\*\* [and the disallowances and approved rates] should not impair IP's ability to provide safe, adequate and reliable electric service."

In its application for further rehearing, IP proposed to demonstrate that the Commission's prediction of an improvement in its bond ratings was in error and that IP's shareholders and the financial markets had in fact reacted adversely immediately after the Commission's August 7, 1992, order was issued. At the time of oral argument before this court, however, it was undisputed that IP's Standard & Poor's bond rating remained BBB.

■ To revisit the issue of financial viability every time the stock/bond markets fluctuate would be, obviously, an impossibly onerous burden on the Commission's resources. Where the Commission has given consideration to the evidence presented to it, and its determination that the rates imposed do not impair the utility's ability to provide safe, adequate and reliable service is supported by the evidence, the inquiry may end. Contrary to IP's position on appeal, we find that the record before us demonstrates that the Commission's rejection of IP's position was supported by the evidence, and the Commission did not err in denying IP's application for yet another rehearing to introduce new evidence in support of its financial integrity argument. Accordingly, we hold that no reversible error was committed in the Commission's consideration of IP's financial viability or in its denial of IP's application for another rehearing on this ground.

III. RATE OF RETURN ON COMMON EQUITY

IP next argues that the Commission's determination setting IP's rate of return on common equity (ROE) at 12.40% was not supported by the evidence and was not based on findings and analysis sufficient to allow informed judicial review. We again do not agree. Witnesses testifying about IP's cost of equity and fair rate of return included Dr. Eugene Brigham for IP, Scott Rungren for Staff and David Parcell for OPC/CUB. The primary analyses used by these witnesses to determine IP's cost of common equity were the discounted cash flow (DCF) model and the capital asset pricing model (CAPM). Dr. Brigham explained that he had based his analyses on comparable utilities because IP was not paying a common stock dividend at the time of his analysis and IP's beta, a component of CAPM, was distorted due to a recent period of financial distress. He estimated IP's average cost of common equity to be 13.37% in the DCF model and 13.86% in the CAPM model. He said he included a 50-basis-points flotation cost recovery factor because the analyses did not account for issuance expenses. He concluded that a higher return on equity on rate base assets should be allowed if investors were to earn their required return on their total investment. Based on Dr. Brigham's analyses, IP requested a ROE of 13.69%.

Staff witness Rungren utilized the same two models and comparable publicly traded utilities for his analyses. His selection of the comparables was based on a three-year average of eight risk measures. Based on his DCF analysis, Rungren estimated IP's cost of equity in the range from 11.30% and 12.59%. In his CAPM model, Rungren used the short-term Treasury Bill rate for one analysis and the long-term Treasury Bond for another. The short-term Treasury Bill rate yielded a 12.16% cost of common equity and the long-term Treasury Bond resulted in a 13.20% cost of common equity. Applying his own informed judgment to the figures, Rungren estimated that IP's cost of common equity ranged between 12.40% and 13.00%. He said he further adjusted these rates by adding 17 basis points for flotation costs at the low end of the range and 18 points at the high end and recommended that IP be awarded a 12.88% ROE.

OPC/CUB witness Parcell performed his analyses using a DCF model and a "comparable earnings model" with a CAPM analysis as a check. Using the DCF analysis Parcell found IP's cost of equity was 11% to 12%. In the comparable earnings analysis, Parcell determined IP's cost of equity to be between 12.5% and 13%. His CAPM analysis yielded a 12.3% cost of equity. Parcell explained that he did not apply a flotation cost adjustment factor because IP had no current plans to issue new public offerings of common equity between 1991 and 1995.

Before weighing the testimony of the various witnesses, the Commission determined that IP's ROE should not include a flotation cost factor for the reason given by Parcell and because the evidence presented to the Commission failed to establish that IP had not fully recovered flotation costs from its common stock issuances between 1970 and 1991. In ultimately determining that IP's ROE should be allowed at 12.40%, the Commission noted that allowing a ROE at the low end of Staff witness Rungren's range "is consistent with evidence in this record concerning recent market trends and the passage of amendments to the Public Utilities Act relating to the UFAC [Uniform Fuel Adjustment Clause, Ill. Rev. Stat. 1989, ch. 111⅔, par. 9—220] and the Clean Air Act Amendments," which allow utilities to recover coal transportation expenses under contracts in existence on the effective date of the amendment through the UFAC and reduce IP's risks associated with the Clean Air Act.

■ Having reviewed the evidence presented to the Commission on the issue, we are convinced that the Commission's determination to grant IP a 12.40% rate of return on common equity is supported by substantial evidence, and the determination is in fact based on findings and analysis sufficient to allow informed judicial review. The Commission's determination is entitled to great deference, and it is not the function of this court to reweigh the evidence. (*Leftron Iron & Metal Co. v. Illinois Commerce Comm'n* (1988), 174 Ill. App. 3d 1049, 1060, 529 N.E.2d 610.) Accordingly, having found that the Commission's determination is based on the evidence and the product of that body's reasoned, technical analysis, we hold that the Commission's determination should stand.

### IV. DETERMINATION OF EXTENT OF HARM

OPC/CUB argue that the Commission erred in adopting Staff's "net income" test to determine the extent of harm caused to IP by regulatory lag. Under this test Staff compared IP's earnings for 1987, 1988 and 1989 to its effective return on equity for the three years. Staff acknowledged that using the actual 23-month deferral period would have been preferable to using the three calendar years, but testified that Staff had not had enough time to develop rate base values for each year of the actual deferral period and opined that if the three-year analysis was detrimental to anyone, it would be detrimental to IP.

According to OPC/CUB, their witness, David Effron, used the proper method by determining the loss that IP suffered from not being able to synchronize a rate change with the in-service date of Clinton. Effron used the operating income from the 1989 rate order as a starting point to determine the extent of financial harm. According to Staff, IP's revenue requirement in that proceeding was based on the historical data

for 1986 and adjusted *pro forma* to arrive at a forecasted revenue requirement. Staff criticized Effron's use of data from the 1989 rate order because actual data for the deferral period was available.

We begin our analysis with reference to *BPI II*. The court there prefaced its discussion by observing that to qualify for an accounting variance for recording purposes during the lag period, the utility "must show that (1) circumstances beyond its control have created a significant regulatory lag between the in-service date and the date of the Rate Order, and that (2) denial of the accounting variance could significantly and adversely affect the company's earnings, as well as its short-term and long-term cost of capital. (ICC Docket No. 85—0092; *Re Commonwealth Edison Co.* (Ill. Com. Comm'n Oct. 3, 1985), 70 Pub. Util. Rep. 4th 107, 114.)" *BPI II*, 146 Ill. 2d at 233, 585 N.E.2d at 1056.

For our purposes, it is part 2 that is in issue. The Commission in *BPI II* had determined that actual harm to the utility during the deferral period had to be based on the record as it stood on January 1, 1988, the beginning date for recording deferred post-construction costs for the utility's Byron Unit 2 plant. As of January 1, 1988, the utility's revenue requirements were based on financial forecasts made in 1987. Since the rate case had been filed in 1990, actual historical data was in fact available for all or part of the deferral period. Our supreme court ruled that the Commission's legal determination to apply the actual harm test based on forecasted financial data, and ignoring actual historical data, was arbitrary. The court was particularly concerned about allowing the utility to record and recover over $1 billion in deferred charges if the actual financial data available refuted the forecasted data upon which the allowed recovery was based. Accordingly, the court remanded the cause for a determination of any "significant adverse financial impact" actually suffered by the utility between the in-service date and the date of the rate order. 146 Ill. 2d at 236, 585 N.E.2d at 1058.

■ In this case, as in *BPI II*, the test used by the Commission relied on financial data outside the actual deferral period. By using three calendar years, instead of the actual 23-month deferral period, the Commission arbitrarily assumed that any financial impact of the additional four months in 1987 and nine months in 1989 would be detrimental only to IP. We find no sound basis for this assumption. Accordingly, we find that this case must be remanded for further proceedings to determine actual, significant financial harm, if any, suffered by IP during the April 24, 1987, through March 30, 1989, deferral period.

Further, the Commission rejected application of rate-setting adjustments as proposed by OPC/CUB witness Effron because "an analysis which identifies all appropriate rate setting adjustments has not been

presented in this case." It thus appears that the Commission agreed generally with the position of OPC/CUB that such adjustments should be applied in the "actual harm test" if the Account 186 balance is to accurately reflect what the utility "lost" because of failure to synchronize rate recognition with in-service. We anticipate that on remand the parties will present to the Commission's satisfaction appropriate rate-setting adjustments so that the recalculated recoverable Account 186 balance is an accurate, rather than an "estimated," figure.

### V. CALCULATION OF TEST YEAR BALANCE OF DEFERRED COSTS

Finally, we consider IP's argument that in its August 1992 order the Commission erred in calculating the amortization of recoverable deferred charges for the period between March 31, 1989, through June 30, 1992, and understated the test year balance of deferred costs.

Our review of this issue is hampered to some extent by the various appellees' uniform failure to track the issues presented by the appellant, IP. While we do not in any respect fault the quality of the briefing in this case or the professionalism of the attorneys' presentation in this court, it bears repeating that the parties may not expect an appellate court of general jurisdiction to come to these cases with the same or comparable expertise in ratemaking determinations as can be expected at the Commission level. (See *United Cities Gas Co. v. Illinois Commerce Comm'n* (1992), 235 Ill. App. 3d 577, 594, 601 N.E.2d 1014 (Lund, J., dissenting).) For our benefit, it would be helpful if all parties would confine themselves to presenting arguments in direct response to the issues and, to the extent possible, track the issues as offered by the party-appellants.

Despite the confusing manner with which the parties' arguments are presented in this case on review, we note that it is not disputed that the Commission failed to grant the utility's application for rehearing wherein IP took issue with the Commission's calculation of the test year balance of deferred costs. The Commission in this appeal suggests that its calculation of the deferred equity return corrected all errors to Account 186 and properly reflected appropriate amortization on a prospective basis. To adopt IP's position, the Commission asserts, would constitute retroactive ratemaking.

From the record before us, we cannot determine whether the Commission incorrectly subtracted an amortization of deferred costs previously disallowed in the Commission's 1989 rate order even though such costs had not, in fact, been recovered by the utility. If a mere mathematical error resulted in a double reduction for the disallowed deferred charges, the mistake should be remedied. If, however, the calculation was designed to account for errors in Account 186 on a prospective ba-

sis, then what IP perceives as ministerial error was in fact an informed policy decision and should not be disturbed. Therefore, because this cause must be remanded for further proceedings to determine the extent of harm and we cannot determine on review that the Commission's calculation was not flawed as charged, we hold that the Commission should permit IP on remand to fully present its position so that if a miscalculation in fact was made it may be corrected.

### VI. CONCLUSION

For the reasons stated, we remand this cause to the Commission for further proceedings to determine the extent of financial harm, if any, suffered by IP during the regulatory lag period of April 24, 1987, to March 30, 1989, using actual financial data for said period and to verify its calculation of the test year balance of deferred costs upon consideration of IP's evidence of an alleged double deduction from recoverable deferred charges. In all other respects, we affirm the decision of the Commission.

Affirmed in part; reversed in part and remanded.

McCUSKEY, P.J., and BRESLIN, J., concur.

### ORDER UPON DENIAL OF REHEARING

Illinois Power (IP) and the Commission both filed petitions for rehearing. Upon due consideration of the issues raised by the parties, it is the decision of this court that those petitions should be denied; however, we have modified our opinion to correct a misstatement in our discussion of the Commission's disallowances of deferred costs.

IP points out that we erroneously stated in our original opinion that "the Commission determined that only 27.2% of Clinton was used and useful *on April 24, 1977, Clinton's in-service date*" (italicized clause deleted in our modified opinion). In fact, as all parties agree, the Commission's used and useful determination made in its March 1989 rate order was derived from data projected for 1988, 1989 and 1990.

IP urges that, inasmuch as actual data presented to the Commission for the regulatory lag period established a higher used and useful percentage, it is being unfairly punished contrary to the dictates of *BPI II* by using the estimated used and useful figure. IP further argues that even if the Commission had determined the extent to which the Clinton plant would have been found used and useful based on hypothetical data projected as of April 24, 1987, that percentage would have been greater than 27.2%.

In our opinion, the Commission's use of the used and useful percentage derived for purposes of the rate order was not error. The used and useful percentage of the Clinton plant was fully litigated in connection with the rate case, and our review of the record before us does not disclose that the formula adopted by the Commission would have resulted in a greater percentage if a used and useful projection synchronized with the date Clinton went on-line had been calculated for the deferral period. Since IP has demonstrated no prejudice resulting from the use of the figure developed for the March 1989 rate order, we find no basis for reversing the Commission's order disallowing 72.8% of IP's deferred common equity financing costs.

Moreover, inasmuch as *BPI II* does not allow the utility to recover more of its deferred common equity financing costs than it would have with a synchronized order, application of actual, historical data in this regard could not have benefitted IP.

Accordingly, we have modified our opinion to correct the misstatement of fact, and we deny petitions for rehearing brought by both IP and the Commission.